**Joshua BERNSTEIN and Jordana Bernstein, Appellants,**

v.

**Matthew THOMAS and Lindsay Thomas, Appellees.**

No. 05–08–00531–CV.

Court of Appeals of Texas, Dallas.

Oct. 13, 2009.

Joshua Bernstein, Miller & Curtis LLP, Melvin H. Wolovits, Thad D. Spalding, Hermes Sargent Bates, L.L.P., Dallas, TX, for Appellant.

Eugene A. "Chip" Brooker, Jr., Heather Bailey New, Haynes & Boone, L.L.P., Dallas, TX, for Appellee.

Before Justices MORRIS, RICHTER, and LANG–MIERS.

## OPINION

Opinion By Justice MORRIS.

This appeal follows a jury trial. Appellants Joshua and Jordana Bernstein present three issues challenging the jury's verdict in favor of Matthew and Lindsay Thomas on a claim under the Texas Deceptive Trade Practices Act. The Bernsteins first contend the trial court erred in failing to direct a verdict or grant their motion for judgment notwithstanding the verdict because the evidence presented at trial negated the element of reliance as a matter of law. Second, the Bernsteins contend the evidence is legally and factually insufficient to show that their acts or omissions were a producing cause of damages to the Thomases. Finally, the Bernsteins contend the evidence is legally and factually insufficient to support the amount of damages awarded by the jury. After reviewing the record on appeal, we affirm the trial court's judgment.

## I.

The facts are largely undisputed. In early 2004, Joshua and Jordana Bernstein put their house on the market for sale. The Bernsteins originally listed the house with Keller Williams Realty and, in connection with the listing, filled out a seller's disclosure notice. One of the questions on the form inquired whether the seller had "ever obtained a written report about the condition of the foundation from any engineer, contractor, inspector, or expert." The Bernsteins responded "no."

Several months after listing the house, the Bernsteins contacted Bedrock Foundation Repair. According to the Bernsteins, several prospective purchasers had commented on the sloping of the home's floor and they wanted an estimate of how much it would cost to "correct the slope." The estimate, prepared by Don Hill and entitled "Proposal for Foundation Repair," stated it would cost $6,950 to raise the front wall, front right corner, front left wall, and garage wall to "a reasonably level position." The estimate also stated that leveling the foundation would require "19 concrete double pilings driven to a substantial point of refusal, or 40 feet, whichever comes first." Finally, the estimate indicated that the void under the

concrete slab would need to be filled with soil concrete slurry. Hill testified that, in his opinion, the house needed a "fairly significant amount of foundation work" because the house was "out of tolerance and needed to be lifted." Hill further opined that the recommendations he made were not just for "cosmetic appeal."

Sometime after obtaining the estimate, the Bernsteins terminated their listing agreement with Keller Williams and hired Kari Bernstein, Joshua Bernstein's sister-in-law, as their listing agent. The Bernsteins then executed a new seller's disclosure notice. The new form did not inquire whether they had ever obtained a written report about the condition of the foundation. Instead, the form simply asked whether the seller was aware of any "defects" or "malfunctions" in various parts of the property, including the foundation. In response to the inquiry about defects or malfunctions in the foundation, the Bernsteins indicated they were not aware of any.

In April 2004, Matthew and Lindsay Thomas began looking at houses with a view toward purchasing their first home together. One of the homes they visited with their real estate agent was the Bernsteins'.. After visiting the house two times and reviewing the seller's disclosure notice, they decided to make an offer. The house was listed for $189,000. The Thomases submitted an initial bid of $173,900. After some negotiations, the Bernsteins and Thomases agreed on a purchase price of $181,000. Mr. Thomas testified that he was aware of the sloping floor and took into consideration the condition of the house when he negotiated the price. In addition to negotiating the purchase price, the parties also agreed, at the request of the Bernsteins, to reduce the option period from the standard two weeks to only five days.

The Thomases had the house inspected by a professional property inspector the day after they signed the contract. The Thomases were present during the inspection and reviewed the report with the inspector. Referencing the foundation, the report stated that "some movement [had] occurred in the structure of the home." The report further stated that "for a more technical analysis on the condition of the foundation, a structural engineer should be consulted." In a separate section addressing ceilings and floors, the report noted "there are some areas in the home where the floor feels to be out of level." The report does not recommend that a specialist be consulted about the sloping. It does recommend, however, that specialists be consulted about the roof, pool, fireplace, branch circuits in the electrical systems, dishwasher, oven, and range. When the Thomases asked about the suggested specialists, the inspector told them that the recommendations were standard to cover the inspector if anything came up later. The inspector also said that all of the problems he noted were typical based on the age of the house and there was nothing to be concerned about. He told them specifically that the sloping floor was natural for the age of the home.

Following the inspection, Mr. Thomas returned to the house one more time to take measurements of various parts of the house, including the slope in the floor, to determine whether certain improvements and renovations could be done. To measure the sloping, Mr. Thomas used an optical level placed on a tripod. Mr. Thomas borrowed the level from his employer, Cadence McShane, a commercial construction company. According to Mr. Thomas, when he arrived at the house, he spoke with Mr. Bernstein who told him he didn't know what the "fancy equipment" would tell him because "there was nothing wrong

with the house." Mr. Bernstein denied referring to any "fancy equipment" but conceded he told Mr. Thomas there was nothing wrong with the house.

Mr. Thomas stated he was inexperienced in using the level because he worked in the corporate offices of his company and did not do actual construction work. Mr. Thomas's uncle, who had done some remodeling work, showed him how to use the level. After taking measurements, Mr. Thomas calculated there was approximately two inches of variance in the level of the floor in the area he was able to view. In Mr. Thomas's opinion, this amount of variance was not a concern. The Thomases purchased the house as scheduled a few days later.

Several months after the closing, the Thomases received a letter addressed to the Bernsteins or the current resident of the house from Bedrock Foundation Repair. The letter indicated that it was following up on the company's earlier evaluation and estimate. The Thomases called Bedrock and asked to have a copy of the estimate sent to them. Mr. Thomas then called Mr. Bernstein to discuss what he had received. According to Mr. Thomas, Mr. Bernstein initially denied any knowledge of the estimate. Mr. Bernstein later admitted he had, in fact, received the estimate but decided not to have the work performed. After exchanging letters, the Thomases brought this suit alleging claims for fraudulent inducement, common law fraud, fraud in a real estate transaction, breach of contract, and violations of the Texas Deceptive Trade Practices Act. They requested actual, consequential, and incidental damages in an amount not less than $26,970 to cover the cost of repairing the foundation as well as repairing other parts of the house that would be damaged in the process of leveling the house.

The case was tried to a jury. After the Thomases presented their evidence, the Bernsteins moved for a directed verdict. The trial court denied the motion. The Bernsteins then presented their evidence, and the case was submitted to the jury. The jury returned a verdict in favor of the Thomases on their claims under the DTPA and awarded them $16,550 in damages. The Bernsteins moved for a judgment notwithstanding the verdict arguing there was no evidence to support the jury's findings. The trial court denied this motion as well and signed a judgment in accordance with the jury's verdict. The Bernsteins brought this appeal.

## II.

■ In their first issue on appeal, the Bernsteins contend the trial court erred in failing to direct a verdict in their favor or grant their motion notwithstanding the verdict on the Thomases' claims under the DTPA. The Bernsteins argue the Thomases' professional inspection and independent measurements of the house negate the element of reliance as a matter of law. A court may direct a verdict if no evidence of probative force raises a fact issue on a material element of the plaintiff's claim. *See Prudential Ins. Co. v. Fin. Review Servs.*, 29 S.W.3d 74, 77 (Tex.2000). A court may also direct a verdict if the evidence conclusively establishes a defense to the plaintiff's cause of action. *Id.* A judgment notwithstanding the verdict is proper when a directed verdict would have been proper. *Fort Bend County Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991). For purposes of both a directed verdict and a JNOV, we review the trial court's determination under a legal sufficiency standard. *See Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex.2005).

In reviewing the legal sufficiency of the evidence, we view the evidence in the light

favorable to the findings, crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not. *Id.* at 827. The ultimate test of legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Id.* Anything more than a scintilla of evidence is legally sufficient to support a challenged finding. *See OAIC Commercial Assets, L.L.C. v. Stonegate Village, L.P.*, 234 S.W.3d 726, 736 (Tex.App.-Dallas 2007, pet. denied).

■ The Bernsteins challenge the trial court's failure to direct a verdict on the Thomases' claim or render a JNOV on the jury's finding that the Bernsteins engaged in a "false, misleading or deceptive act or practice that [the Thomases] relied on to their detriment and that was a producing cause of damages to [them]." The Bernsteins argue that any representation they made was not relied upon by the Thomases because the Thomases were fully aware of the sloping in the floor when they purchased the home and they were advised by their inspector to consult with a structural engineer about the condition of the foundation. Although the Thomases do not dispute they were aware of both the sloping in the floor and their inspector's recommendation, they testified they relied on the Bernsteins' statement in the sellers disclosure as well as Mr. Bernstein's assurance that there was "nothing wrong with the house" to allay any concerns about the condition of the house, including the foundation, before they purchased it.

The Bernsteins argue that the facts in this case are similar to those presented in the case of *Dubow v. Dragon*, 746 S.W.2d 857 (Tex.App.-Dallas 1988, no writ). In *Dubow*, the buyers hired a professional inspector who informed them the house they intended to purchase had various existing and potential problems, including the need for foundation repairs. *Id.* at 858–59. The buyers then procured estimates of the cost to correct the problems and renegotiated the sales price to lower it accordingly. *Id.* The contract of sale was modified to include the following language:

> After careful inspection of the house, and with professional opinions, [w]e feel that the house will need extensive ongoing maintenance because of the site positioning, foundation and drainage. See attached inspection report. We will take the home as is, WITH ALL CONTINGENCIES REMOVED.

(emphasis in original). *Id.* After taking possession of the house, the buyers encountered additional problems with the house, including its foundation, and sued the sellers for failing to disclose their knowledge of the home's condition. *Id.*

Based on the facts presented in *Dubow*, this Court concluded that "the [buyers'] 'careful' inspection of the house's condition constituted a new and independent basis for the purchase which intervened and superseded the [sellers'] alleged wrongful act." *Id.* at 860. As we stated in our later opinion, *Fernandez v. Schultz*, 15 S.W.3d 648, (Tex.App.-Dallas 2000, no pet.), the critical factor in *Dubow* was the buyers' "express and exclusive reliance on the 'professional opinions' they received to renegotiate the sales contract that resulted in the sale of the house." *See Fernandez*, 15 S.W.3d at 652. This critical factor is not present in the case before us. The evidence here shows the Thomases did not rely expressly or exclusively on either the opinion of their inspector or their own observations before deciding to go forward with the purchase. To the contrary, the evidence shows the Thomases specifically relied on the Bernsteins' representations and assurances about the condition of the house, including the foundation. Unlike *Dubow*, there was no renegotiation of the contract based on information provided by

the inspector, and neither the inspector nor Mr. Thomas discovered the house needed extensive foundation work before the purchase.[1] Furthermore, the Thomases testified that if they had known about the extensive work needed to fix the foundation, they would not have purchased the property. Accordingly, *Dubow* is not controlling. *See id.; see also Kupchynsky v. Nardiello,* 230 S.W.3d 685, 689 (Tex.App.-Dallas 2007, pet. denied).

The Bernsteins argue that because the Thomases knew about the sloping in the floor, made independent measurements, and were advised by their inspector to consult a structural engineer, they had or should have had "equal knowledge about the condition of the home" and that such knowledge negates the element of reliance. Awareness of sloping in the floor, however, does not equate to awareness of required repair work. *See Smith v. Levine,* 911 S.W.2d 427, 431 (Tex.App.-San Antonio 1995, writ denied). It is undisputed that the Bernsteins did not disclose the repair estimate prepared by Bedrock either to the Thomases or to their inspector. Only the Bernsteins, therefore, had any knowledge of the repair work necessary to fix the foundation at the time they sold the house to the Thomases. Although the Bernsteins contend they did not impede the Thomases' inspection of the foundation in any way, the jury could have reasonably concluded from the evidence presented that the Bernsteins' assurances about the condition of the house, and their specific representation that there was no defect or malfunction in the foundation, played a

part in dissuading the Thomases from further investigation. Such evidence includes Mr. Thomas's testimony that Mr. Bernstein's statements to him about the condition of the house "eased any concerns" he had. After reviewing the record, we conclude the evidence is legally sufficient to support the jury's finding of reliance and the trial court did not err in refusing to grant the Bernsteins either a directed verdict or a JNOV.

■■ In their second issue on appeal, the Bernsteins contend the evidence is legally and factually insufficient to support the jury's finding that their act or omission was a substantial factor or "producing cause" of injury to the Thomases. The Bernsteins repeat many of the same arguments made under their first issue but recast them in terms of producing cause and factual sufficiency. When reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence. *See Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986) (op. on reh'g). We may set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id.*

■ The Bernsteins contend the evidence shows the producing cause of the Thomases' alleged injuries was their own failure to investigate the sloping in the floor. The Thomases testified that they did not pursue an investigation of the foundation because they were assured by both their inspector and the Bernsteins that the house was in good condition and

---

1. The Bernsteins argue that the $8,000 reduction from the initial listing price of $189,000 to the purchase price of $181,000 took into account the problems with the foundation. Although Mr. Thomas testified that he considered the condition of the house, including the slope in the floor, when he agreed to the $181,000 purchase price, the evidence shows this agreement was the result of typical offer,

counter-offer negotiations which took place before the professional inspection and Mr. Thomas's independent measurements of the slope in the floor. The only specific information Mr. Thomas had about the condition of the foundation at the time he agreed to pay $181,000 came from the seller's disclosure, which stated the foundation had no defects or malfunctions.

the sloping in the floor was normal for the age of the house. Although the inspector's failure to discover the foundation issues identified by Bedrock, together with his assurances about the condition of the foundation, may have been a producing cause of the Thomases' injuries, there may be more than one producing cause of damages in a case. *See Fernandez,* 15 S.W.3d at 653. In this case, the Bernsteins' failure to disclose the repair estimate and their statements to the Thomases, including the seller's disclosure notice, were also producing causes of the Thomases' damages.

The Bernsteins argue that their statements on the seller's disclosure notice and assurances to the Thomases about the condition of the house were consistent with their knowledge of, and experience with, the house. They contend that, despite the fact that they received a repair estimate, they were not aware of any "defect" or "malfunction" in the foundation. They characterize the Bedrock estimate as merely showing the cost to correct the sloping in the floor if such correction was desired and not a necessary repair to the home. According to the Bernsteins, the Thomases have exaggerated the nature of the undisclosed information for the purposes of litigation as is demonstrated by the fact that the Thomases had made none of the repairs by the time of trial.

■ To the extent the Bernsteins are arguing that there is insufficient evidence to show they committed a "false, misleading, or deceptive act or practice," they have not presented an issue challenging that finding on appeal. To the extent they are arguing their statements could not have been the producing cause of any injury to the Thomases because the Thomases have not suffered an injury other than the sloping floor of which they were already aware, we conclude the Bernsteins' argument is without merit.

Dan Hill, who evaluated the foundation and prepared the estimate for Bedrock, testified that, although sloping in a floor does not necessarily indicate a functional problem with the foundation, a house two inches out of level, like the Thomases', has almost twice the amount of "acceptable tolerance" for a home. Hill further opined that a house as far out of tolerance as the Thomases' needs to be repaired because the variance could put pressure on the plumbing and cause significant damage to the brick facade. Hill stated he did not use the term "defect" in the initial estimate given to the Bernsteins because "defect" was not a term he generally used. He did, however, feel the suggested repairs reflected in the estimate given to the Bernsteins were necessary. Although the Thomases did not experience any additional problems with the foundation before they filed suit, Hill testified that houses may not have any foundation movement for years before significant movement occurs. In fact, Hill evaluated the Thomases foundation in October 2006, two and a half years after his initial evaluation for the Bernsteins, and concluded the foundation had degraded to the point of needing twenty-five concrete double pilings to raise the level of the house instead of the original recommendation of nineteen.

Based on this evidence, the jury could have reasonably concluded that the foundation was defective and needed to be repaired at the time the home was sold to the Thomases. The jury could also have reasonably found the Bernsteins were aware of this fact by virtue of the repair estimate they received. Although the Thomases were aware of the sloping, there is no evidence they were aware of the foundation problems and the repairs required to correct them. Accordingly, the evidence is both legally and factually sufficient to show that the Bernsteins' acts of failing to disclose the estimate, and their representations that the foundation had no

defects or malfunctions, were substantial factors in causing the Thomases to purchase a home that, unknown to them, required thousands of dollars in foundation repairs. We resolve the Bernsteins' second issue against them.

■■■■ In their third and final issue, the Bernsteins contend the trial court erred in failing to grant their suggestion of remittitur because the evidence is legally and factually insufficient to support a jury award in excess of $6,950 in damages. The $6,950 amount is the estimated cost of repairs to the foundation originally submitted by Bedrock to the Bernsteins in 2004. The jury awarded the Thomases $16,550 as the reasonable and necessary costs to repair the home. In determining whether to order a remittitur of excessive damages, we must examine all of the evidence in the record and remit only if some portion is so factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Pope v. Moore*, 711 S.W.2d 622, 624 (Tex. 1986).

■■■ The Bernsteins contend the Thomases failed to establish a causal nexus between their allegedly deceptive acts in 2004 and any increase in the cost to repair the house over and above the original 2004 estimate. The burden is on the plaintiff to produce evidence from which the jury may reasonably infer that the damages claimed resulted from the defendant's conduct. *Texarkana Mem'l Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 838 (Tex. 1997). A plaintiff satisfies this requirement when it presents the jury with proof that establishes a direct causal connection between the damages awarded, the defendant's actions, and the injury suffered. *Id.*

The Bernsteins argue that various factors including the Thomases' renovations, alterations to the landscaping, and their possible failure to water the property regularly may have caused or contributed to the increased cost of repair. Hill testified, however, that he had no knowledge that anything the Thomases did caused the difference in the condition of the foundation between his initial evaluation in 2004 and his follow-up evaluation in 2006. Hill further testified that a foundation that is not repaired may continue to shift and cause significant damage. Accordingly, the jury could have reasonably concluded that the Bernsteins' failure to inform the Thomases about the need to repair the foundation in 2004 caused the foundation to remain unrepaired, which in turn, allowed it to continue to degrade. The evidence, therefore, establishes a causal link between the Bernsteins' acts and omissions in 2004 and the increased cost of repair at the time of trial.

Finally, the Bernsteins argue that the Thomases were required to prove the reasonableness and necessity of the alleged costs to repair the property and they failed to provide any competent evidence to meet this burden. The Thomases respond that their testimony combined with Hill's testimony and the numerous repair estimates submitted into evidence were more than sufficient to support the full amount awarded by the jury. We agree.

At trial, Hill testified that repairs to the foundation were necessary because the house was out of tolerance. Hill further testified that if the foundation was not repaired, it was possible that significant damage to the house could occur. During the two and a half year period between his first and second evaluations, the condition of the foundation worsened to the point that additional work was required to level the house. Hill stated that, in the process of lifting the walls and floor to fix the foundation, cosmetic damage to the house would likely occur resulting in the need for other repairs. The Bernsteins' only evidence that repairs were not necessary was their own testimony that neither they nor the previous owners had experienced prob-

lems with the foundation while living in the home. The Bernsteins also noted that the Thomases continued to live in the home without any foundation repairs having been made. Because the evidence showed that the condition of the foundation was continuing to degrade, evidence of past, and even present, habitability would not necessarily indicate that repairs were not required. We conclude the evidence is both legally and factually sufficient to support the jury's conclusion that repairs to the home were necessary.

As for the latter portion of the Thomases' burden of proof, the Bernsteins argue that the Thomases' only evidence of reasonableness came from the testimony of Mrs. Thomas and she was not qualified to testify about the reasonableness of the estimated costs of repair. The Bernsteins contend the Thomases were required to provide testimony either from the people who made the estimates or other experts to support the alleged costs. The Texas Supreme Court recently rejected this exact argument. *See Bennett v. McDaniel,* 295 S.W.3d 644 (Tex.2009) (per curiam). An objective valuation of services, such as a bill, receipt or, as in this case, an estimate, is evidence from which a jury can infer reasonable cost of repair. *See 2 Fat Guys Investment, Inc. v. Klaver,* 928 S.W.2d 268, 273 (Tex.App.-San Antonio 1996, no writ). In addition, a plaintiff may testify about the reasonableness of an estimate. *See Bennett,* 295 S.W.3d at 645.

The Thomases submitted multiple estimates from various companies on the cost to repair the foundation. These estimates ranged from $7,480 to $12,600. Hill testified based on his years of experience, training, and close examination of the house that he believed it would cost $10,550 to repair the foundation. The Thomases also submitted a bid from a construction company on the cost to repair the cosmetic damages to the house after the foundation work was completed. The company's bid included $15,850 to repair the floors, $2,670 to repair the baseboards, $870 to replace damaged landscaping, and $630 to repair the flagstone walkway for a total cost of $20,020. Mrs. Thomas testified that this estimate was reasonable in her mind. There was no evidence to show that the estimates were not reasonable. The jury ultimately awarded the Thomases $16,550, an amount approximately half of the highest amount of actual damages supported by the evidence. We conclude the evidence is both legally and factually sufficient to support the reasonableness of the damages awarded by the jury. We further conclude the trial court did not err in refusing to grant the Bernstein's suggestion of remittitur. We resolve the Bernsteins' third issue against them.

We affirm the trial court's judgment.