George **LESIEUR**, Appellant,

v.

Timothy **FRYAR**, Sandra Fryar, Cynthia Morales d/b/a Morales Realty, and Cynthia Gonzales, Appellees.

No. 04–09–00397–CV.

Court of Appeals of Texas, San Antonio.

July 14, 2010.

Rehearing Overruled Aug. 31, 2010.

Brendan K. McBride, McBride Law Firm, Matthew R. Pearson, Gravely & Pearson, L.L.P., San Antonio, TX, for Appellant.

Ruben Valadez, Robinson C. Ramsey, Langley & Banack, Inc., San Antonio, TX, John C. Chunn, John C. Chunn, P.C., Hondo, TX, for Appellee.

Sitting: SANDEE BRYAN MARION, Justice, PHYLIS J. SPEEDLIN, Justice, MARIALYN BARNARD, Justice.

## OPINION

Opinion by: MARIALYN BARNARD, Justice.

This appeal arises out of a real estate sale in Medina County, Texas. Appellant George Lesieur, the buyer, brought suit against the sellers, Timothy and Sandra Fryar, and the Fryars' real estate agents, Cynthia Morales d/b/a Morales Realty and Cynthia Gonzalez, alleging claims for fraud, violations of the DTPA, negligence, negligent misrepresentation, and civil conspiracy. In essence, Lesieur claimed the sellers and the real estate agents misrepresented and concealed defects in the home prior to Lesieur's purchase. The trial court granted the traditional and no evidence motions for summary judgment filed by the Fryars, Morales, and Gonzales, thereby ruling that Lesieur take nothing on his claims. Thereafter, the trial court granted summary judgment in favor of Morales and Gonzales on their counterclaim for attorney's fees. The trial

court also granted a motion for severance, making the judgment final for purposes of appeal.[2] On appeal, Lesieur raises four issues, challenging all of the orders in this case. We affirm the trial court's order granting summary judgment in favor of the Fryars, Morales, and Gonzales on Lesieur's substantive claims, but reverse and render judgment in favor of Lesieur on the issue of attorney's fees.

## BACKGROUND

In 2002, Timothy and Sandra Fryar purchased a house and surrounding property in Medina County, Texas. Cynthia Morales d/b/a Morales Realty and Cynthia Gonzales (collectively "Morales Realty") had listed the property on behalf of Jerry and Gloria Kane. Before the purchase, the Fryars hired Adams Home Inspection Company to inspect the house. According to the report generated as a result of the inspection ("the Adams Report"), the foundation of the house showed "[s]igns of structural movement," but was supporting the house. As evidence of structural movement, the inspector noted "[c]racks in walls and/or ceilings," "[d]oor frames out of square," and "[c]racks in brick/stone veneers." However, the inspector did not check the box that would have advised the foundation was "Not Functioning or In Need of Repair." The Fryars purchased the home, and admittedly made no repairs.

In 2005, the Fryars decided to sell the house and property, and hired Morales Realty to list it. Lesieur was interested in purchasing the house and property, and the parties began to take steps to conclude a sale. On June 28, 2005, Lesieur and his wife[3] entered into a "Farm and Ranch Contract" ("the contract") with the Fryars

for the sale of the property. The contract set the closing date for July 28, 2005.

The contract noted that a "Seller's Disclosure Notice" ("the disclosure") had been provided to Lesieur. Within the disclosure, the Fryars were required to note defects, malfunctions, or conditions of which they were aware. They noted no problems with the foundation, walls, floors, or ceilings. The Fryars also disclaimed receiving any written inspection reports from any licensed inspector within the last four years. This was despite the Adams Report the Fryars admittedly received in 2002, which was maintained in their real estate file by Morales Realty.

The contract allowed Lesieur to have the property inspected by a licensed inspector of his choice. In accordance with this contract provision, Lesieur hired National Property Inspection to conduct an inspection of the house. As a result of the inspection, the inspector generated a report ("the NPI Report"). The NPI Report lists the client as the Lesieurs, and described numerous problems in the section of the report applicable to "Structural Systems," which included the foundation, floors, walls, ceilings, doors, windows, the roof, and carport. The report specifically noted "[s]tress cracks" in the floor tile in the carport and inside the house. The inspector noted these cracks were "observed both through the tile as well as in the grout joints." The inspector opined that "[t]hese types of cracks usually reflect what is occurring on the slab itself." "Stress/settlement cracks" or "[s]ettlement cracks" were also observed in the interior and exterior walls, and the ceiling. Just as the inspector who prepared the Adams

---

2. Lesieur brought suit against others as well; however, they are not parties to this appeal because they have either settled with Lesieur or have otherwise been dismissed.

3. Diana Lesieur signed the documents evidencing the purchase of the property. However, the suit was filed by Lesieur individually.

Report, the NPI inspector did not check the box that would have advised the foundation was "Not Functioning or In Need of Repair."

Lesieur, who was represented by his own real estate agent and attorney, was advised by his realtor to review the inspection report, concentrating on safety and structural issues. The realtor also reminded Lesieur that pursuant to the contract he had a ten-day option to terminate the contract, and noted the expiration date. Lesieur testified in his deposition that he reviewed the report, and decided on the repairs he wanted the Fryars to complete. Lesieur never contacted the inspector or spoke to him about the report. As a result of the inspection, an amendment to the contract was signed, requiring numerous repairs or treatments. However, there was no mention of repairs to the foundation, or to any cracks observed during the inspection, despite the advice from Lesieur's realtor to focus on structural problems. Lesieur admitted he saw the inspector's comments regarding the foundation and the various cracks throughout the house, but did not talk to the inspector about these issues, and felt comfortable proceeding with the closing. Lesieur stated he believed the problems noted were "cosmetic."

In addition to hiring his own inspector, Lesieur and his wife completed a walk-through of the house before the closing. They signed a "Buyer's Walk–Through and Acceptance Form" on the day of, but prior to, the closing. At the closing, the Fryars and the Lesieurs met for the first time. Both were represented at the closing by their own realtors and attorneys.

Lesieur moved into the house approximately two months after the closing. Shortly after he moved in, he began to notice signs of possible foundation problems. Lesieur hired Olshan Foundation Repair Company ("Olshan") to conduct another inspection. The Olshan inspector claimed the foundation needed repair, and "there was an attempt to conceal signs of damage to the foundation of the home" by taping and floating cracks in the drywall of interior walls, and covering up exterior cracks with mortar. The inspector did not say who concealed the alleged evidence of foundation damage, or when it might have occurred.

After receiving the report from Olshan, Lesieur filed suit against the Fryars and Morales Realty, among others, alleging violations of the DTPA, common law fraud, statutory fraud pursuant to section 27.01 of the Texas Business and Commerce Code, civil conspiracy, negligence, and negligent misrepresentation. His claims were based, for the most part, on the alleged concealment of the Adams Report and the foundation problems he contends were noted therein. Lesieur claimed he was fraudulently induced into the contract in at least three particulars. First, the Fryars knowingly misrepresented on the Seller's Disclosure that they knew of no defective conditions with regard to the property. This representation was made despite the fact that the Fryars had the Adams Report, which noted conditions that could potentially affect the foundation, which they admittedly never repaired. Second, both the Fryars and Morales Realty knew about the Adams Report, yet concealed its existence, with the Fryars going so far as to deny any inspection had been conducted in the last four years. According to Lesieur, Morales Realty knew about the Adams Report, had a copy in their files, and knowingly passed the Fryars' false disclosure statement onto him without revealing the existence of the Adams Report and the foundation problems noted therein. And finally, apart from the false representations in the dis-

closure statement and the concealment of the Adams inspection report, Lesieur claims the Fryars took steps to conceal the damage to the house so it would not be discovered by a buyer or during a visual inspection.[4] The Fryars and Morales Realty responded with general denials, defenses, and claims for attorney's fees.

Ultimately, both the Fryars and Morales Realty moved for summary judgment on both traditional and no evidence grounds as to Lesieur's claims. Morales Realty also filed a motion for summary judgment seeking attorney's fees. The trial court rendered judgment granting the Fryars' and Morales Realty's traditional and no evidence motions for summary judgment without stating the grounds therefor. The court thereafter granted Morales Realty's motion for summary judgment as to attorney's fees, and awarded Morales Realty trial attorney's fees and contingent appellate attorney's fees. Lesieur perfected this appeal.

## ANALYSIS

### Standard of Review

The Fryars and Morales Realty filed both traditional and no evidence motions for summary judgment as to Lesieur's claims, and the trial court, according to the language in its order, granted both. However, because we find the ruling on the traditional motions dispositive, we only recite the standard of review applicable to traditional motions for summary judgment. Courts review a traditional motion for summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex.2005). A traditional motion for summary judgment is granted only when the movant establishes there are no genuine

issues of material fact and it is entitled to judgment as a matter of law on the grounds expressly set forth in the motion. *Browning v. Prostok*, 165 S.W.3d 336, 344 (Tex.2005). When reviewing an order granting a traditional motion for summary judgment, courts take evidence favorable to the nonmovant as true and indulge every reasonable inference from the evidence in favor of the nonmovant. *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997).

### Lesieur's Pre–Purchase Inspection

The Fryars and Morales Realty moved for traditional summary judgment on two grounds. First, they asserted Lesieur could not recover on any of his claims because he purchased the property "as is," thereby negating the elements of causation and reliance in all of his claims as a matter of law. Second, they asserted they were entitled to judgment as to all of Lesieur's causes of action because Lesieur's pre-purchase inspection negated the elements of causation and reliance as a matter of law. We express no opinion as to whether the "as is" clause precludes Lesieur's recovery. However, we hold Lesieur's pre-purchase inspection, and the information he obtained as a result, negates the elements of causation and reliance as a matter of law, thereby precluding recovery on any of his claims.

This court recently addressed this issue in *Lim v. Lomeli*, No. 04–06–00389–CV, 2007 WL 2428078, at *1 (Tex.App.-San Antonio Aug. 29, 2007, no pet.) (mem. op.). In *Lim*, this court was asked to decide whether a buyer's pre-purchase professional inspection negated the elements of reliance and causation as a matter of law. *Id.* at *3. The facts in *Lim* show the

---

4. Lesieur also asserted claims based on an alleged landfill and hazardous materials on the property, but on appeal, has limited his arguments to the claims based on the concealment of foundation defects.

Lims, as buyers, and the Bakers, as sellers, executed a contract, which included a ten-day termination option. *Id.* at *1. During the option period, the Lims hired a licensed inspector to inspect the house. *Id.* The inspector's report listed several findings relating to water damage throughout the house. *Id.* Lomeli, the Lim's realtor, met with the inspector to discuss the findings, and then met with Mrs. Lim. *Id.* According to Mrs. Lim, Lomeli told her " 'not to worry' " about the wood rot and possible water penetration noted in the inspector's report because these were " 'minor' " issues. *Id.* Lomeli's only concern was a large picture window, which he suggested should be repaired. *Id.* The Bakers agreed to pay the Lims for the window in lieu of repairing it. *Id.* Lomeli then advised the Lims to close on the sales contract. *Id.* The Lims claimed they relied on Lomeli's representations and purchased the home. *Id.*

Two weeks after closing, there was a heavy downpour, and the Lims claimed nearly every window leaked and "vast amounts of water ran down the walls, puddled on the window sills, and stained the carpet." *Id.* The Lims brought suit against everyone involved in the transaction, including Lomeli. *Id.* As to Lomeli, they alleged negligent misrepresentation, fraudulent inducement, fraud, DTPA violations, breach of the duty of good faith and fair dealing, breach of fiduciary duty, negligence, and negligence per se. *Id.* Lomeli filed traditional and no evidence motions for summary judgment, which the trial court granted. *Id.*

On appeal, the Lims argued the trial court erred in granting summary judgment based on Lomeli's assertion that the Lims' professional inspection negated the elements of reliance and causation as a matter of law. *Id.* at *3. On review, this court noted the summary judgment record showed the Lims' inspector left dots of paper in the home to notify the Lims of where he saw problems with possible water penetration, and issued a report to the Lims, noting water penetration issues among other things. *Id.* at *3–*4. The Lims also received an inspection report from the Bakers, which indicated prior water penetration problems. *Id.* at *4.

This court held that because the information from the inspection report was equally available to the Lims, causation and reliance were negated as a matter of law. *Id.* The Lims failed to present more than a scintilla of evidence that Lomeli *"knew anything more or different than [they] did about the condition of the home." Id.* (emphasis added). Accordingly, we affirmed the summary judgment. *Id.*

Based on *Lim,* the issue in this case is whether the Fryars and Morales Realty knew "anything more or different" about the foundation based on the Adams Report, which was withheld from Lesieur, than Lesieur did based on his own inspection report. *See id.* To make this determination, we conducted a side-by-side comparison of the information contained in the Adams Report and the NPI Report, as it related to the foundation and potential evidence of defects:[5]

---

**5.** The initials in the first columns denote whether the listed item was "Inspected" ("I"), "Not Inspected" ("NI"), "Not Present" ("NP"), and/or "Not Functioning or in Need of Repair" ("R"). All of the written descriptions contained in this table were included under the "Structural Systems" heading in both reports.

| ADAMS REPORT (Report Prepared for the Fryars) | NPI REPORT (Report Prepared for Lesieur) |
|---|---|
| Y   NI   NP   R <br> [X]   [ ]   [ ]   [ ] | Y   NI   NP   R <br> [X]   [ ]   [ ]   [ ] |
| **1.0 FOUNDATIONS** | **1.0 FOUNDATIONS** |
| **Performance Opinion:**<br>Signs of structural movement noted, however, the foundation is supporting the structure at this time.<br><br>**Evidence of Structural Movement Noted:**<br>Cracks in walls and/or ceilings.<br>Door frames out of square.<br>Cracks in brick/stone veneers. | Stress cracks were observed in the floor tile at Carport area and inside house in spots. these cracks were observed both through the tile as well as in the grout joints. These types of cracks usually reflect what is occurring on the slab itself. No structural cracks were observed around the perimeter of the structure in those areas that were clearly visible. Recommend active monitoring of foundation and structure along with soil moisture maintenance. Visibility was limited due to plant growth in spots. |
| **Walls (Interior and Exterior)**<br>*Comments:*<br>**Interior Walls:**<br>Walls have been recently painted. This tends to hinder the inspection findings. Signs of previous repairs to the wall (Left front bedroom)<br>**Exterior Walls:**<br>The brick/stone siding/veneer and/or mortar is cracked. (Right side, front) | **WALLS (Interior and Exterior)**<br>Interior - Stress/settlement cracks were observed on walls in various spot[s] throughout the house, example inside corners of Bedroom, over Bedroom window, Family room.<br>Exterior - Settlement cracks were observed in mortar joints of stonework in spots around the house. |
| **Ceilings and Floors**<br>*Comments:*<br>**Interior Ceilings:**<br>Cracks noted in the ceiling(s). (Front center bedroom)<br>Noted evidence of previous repairs to the ceiling(s) (Hallway)<br>**Floors:**<br>The floors are visibly unlevel. (Left front bedroom) | **CEILING AND FLOORS**<br>Comments:<br>Ceiling - Stress/settlement cracks were observed in spots, example Hallway, Bedrooms. Corner beads were crack in spots of trey ceilings.<br>Floors - Stress cracks were observed in the floor tile inside house in spots. These cracks were observed both through the tile as well as in the grout joints. |
| **Doors (Interior and Exterior)**<br>*Comments:*<br>The door is rubbing on the door frame and is hard to close. (Left front bedroom) | **DOORS (Interior and Exterior)**<br>Comments: Interior - Bedroom closet door sticks at top. |

■ Based on our review of the pertinent portions of the reports, it is evident that the differences between the reports are merely a matter of word usage, not substance. Obviously, some of the words used by the inspector in the Adams Report are slightly different than those in the NPI Report. The most notable example of this is the reference in the Adams Report to "structural movement," a phrase not used in the NPI Report. However, the inspector who prepared the Adams Report specifically described the evidence of structural movement as cracking in the walls, ceilings, and in the brick/stone veneers, as well as the fact that a door frame was "out of square." In the NPI Report, the inspector noted this same cracking, but specifically referred to it as "stress" or "settlement" cracking. He also noted that a door in a bedroom "sticks at the top," another way of saying "out of square." Accordingly, the same evidence of structural movement noted in the Adams Re-

port was provided to Lesieur in the NPI Report. Moreover, the inspectors who prepared the reports, with regard to the sections entitled "Foundation," checked the boxes denoting that the foundation had been "Inspected," but neither checked the box suggesting the foundation was "Not Functioning or In Need of Repair." Thus, neither inspector believed the home's foundation was currently unsound or in a state of disrepair.

We are aware that under the applicable standard of review, we must indulge every reasonable inference in favor of Lesieur. This indulgence, however, does not require that we parse individual words, nor does it require that we ignore that cracking in the interior of a home is, axiomatically, the result of movement. Thus, an assertion of structural movement—as evidenced by cracking in walls, ceilings, and floors—is no different than an assertion of stress or settlement cracking, particularly when that cracking is described as indicative of "what is occurring on the [foundation] itself."

We agree with Lesieur that the Adams Report referred to a visibly unlevel floor in one of the bedrooms, but no such reference was made in the NPI Report. We hold this does not raise a fact issue as to Lesieur's knowledge versus that of the Fryars and Morales Realty. It is undisputed that Lesieur conducted a personal walk-through of the house before closing. If a floor was "visibly unlevel," he would have had personal knowledge of it based on his walk-through.

Accordingly, we hold that even when every reasonable inference is indulged in his favor, Lesieur failed to present more than a scintilla of evidence that either the Fryars or Morales Realty *"knew anything more or different than [he] did about the condition of the home [,]"* specifically the foundation. *See id.* (emphasis added). The differences in the reports upon which

Lesieur relies are insufficient to create a fact issue as to whether the Fryars and Morales Realty knew something more or different about the house than did Lesieur. In other words, despite the slight variations in the technical terminology used by the two inspectors in the reports, the information provided to Lesieur by the NPI report afforded him the same level of warning with regard to the structural condition of the house that the Adams report would have provided if it had been disclosed. This is all that is required under *Lim* to defeat the elements of causation and reliance. *See id.* Because the information concerning the foundation of the house was equally available to all parties, the Fryars and Morales Realty negated the elements of causation and reliance as a matter of law, and therefore the trial court properly granted summary judgment in their favor.

Lesieur argues *Lim* actually supports his position, arguing that in *Lim* we relied on a case from the Dallas Court of Appeals, *Dubow v. Dragon,* 746 S.W.2d 857 (Tex.App.-Dallas 1988, no writ), to reach our conclusion. Lesieur contends that *Dubow,* as interpreted by several subsequent cases, holds that causation and reliance are not negated as a matter of law unless the evidence establishes: (1) the buyer relied solely on a pre-purchase inspection, which revealed the defect that subsequently forms the basis of the buyer's suit, and (2) there is a renegotiation of the sales contract based on the defect, establishing the buyer's knowledge that this was part of the basis of the parties' bargain. *See Bernstein v. Thomas,* 298 S.W.3d 817, 822–23 (Tex.App.-Dallas 2009, no pet.); *Kupchynsky v. Nardiello,* 230 S.W.3d 685, 688–89 (Tex.App.-Dallas 2007, pet. denied); *Fernandez v. Schultz,* 15 S.W.3d 648, 652 (Tex.App.-Dallas 2000, no pet.). According to Lesieur, because there was no evidence

he relied exclusively on the NPI report, there was no renegotiation based on foundation defects, and no reduction in sales price or inclusion in the contract of terms relating to the foundation, causation and reliance were not negated as a matter of law pursuant to *Dubow* and its progeny.

We agree with Lesieur's interpretation of *Dubow*, as construed by *Bernstein, Kupchynsky*, and *Fernandez*. Clearly, the Dallas Court of Appeals requires a party attempting to negate causation and reliance based on a buyer's pre-purchase inspection to prove (1) the buyer relied solely on the pre-purchase inspection, which revealed the defect that ultimately forms the basis of the buyer's suit, and (2) there was a renegotiation of the contract based on the existence of the defect, thereby establishing the buyer's knowledge of the defect. *See id.* However, we disagree that this court's opinion in *Lim* is based on *Dubow*, or that this court has adopted its more stringent requirements.

In reaching our conclusion that the Lims could not recover because the evidence showed the parties had the same information concerning the defect that formed the basis of the suit, we did not cite *Dubow* for support. *Lim*, 2007 WL 2428078, at *4. If we had intended to rely on *Dubow*, as interpreted in *Fernandez* and *Kupchynsky* (cases decided before *Lim*) and adopted its requirements, we certainly would have cited it, and would have required proof as a matter of law of the requirements stated therein. If we had intended to adopt the requirements of *Dubow* and its progeny, we would not have reached the conclusion we did, because there was no evidence of a renegotiation based on the defect for which the Lims brought suit. *Id.* at *1. Contrary to Lesieur's interpretation, the renegotiation was based on replacing a single panoramic window, not repairs to prevent extensive water penetration. *Id.*

This court's holding in *Lim* in favor of the realtor was based simply on the fact that the same information available to the realtor was available to the buyer—there was no evidence the realtor knew anything more than the buyer. *Id.* at *4. Unlike our sister court, we did not hold that a pre-purchase inspection negates causation and reliance only when there is evidence the buyer relies solely on his inspector's report, the buyer knows about the defect because of his inspection and renegotiates the contract based on that awareness. Accordingly, we rely on *Lim*, and respectfully disagree with the approach of our sister court.

Because the trial court's summary judgment in favor of the Fryars and Morales Realty was proper based on Lesieur's pre-purchase inspection, we need not address his issues challenging the summary judgment on any other grounds. *See, e.g., Dow Chemical Co. v. Francis*, 46 S.W.3d 237, 242 (Tex.2001) (quoting *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex.1989) (holding that when trial court's order granting summary judgment does not specify ground or grounds relied upon for its ruling, summary judgment will be affirmed on appeal if any of theories advanced are meritorious)); *O'Donnell v. Smith*, 234 S.W.3d 135, 140 (Tex.App.-San Antonio 2007), *aff'd*, 288 S.W.3d 417 (Tex.2009).

### Attorney's Fees

Morales Realty counterclaimed for attorney's fees and moved for summary judgment on the counterclaim. The trial court granted the motion for summary judgment, and in its order the trial court specifically stated it was granting the motion based on the Farm and Ranch Con-

tract between Lesieur and the Fryars.[6] Lesieur contends the trial court erred in granting Morales Realty's motion for summary judgment based on their counterclaim for attorney's fees. We agree.

In support of its motion for summary judgment, Morales Realty relied upon paragraph seventeen of the Farm and Ranch Contract:

> ATTORNEY'S FEES: The prevailing party in any legal proceeding related to this contract is entitled to recover reasonable attorney's fees and all cost of such proceeding incurred by the prevailing party.

Lesieur argues this provision will not support an award of attorney's fees to Morales Realty because Morales Realty was not a party to the contract; rather, Morales Realty had a separate agreement with the Fryars for fees. Morales Realty contends it was a party to the contract, either directly or as a third-party beneficiary, but even if it were not, the contractual provision regarding recovery of attorney's fees is not conditioned upon being a party to the contract. Rather, the provision entitles any prevailing party in a legal

proceeding related to the contract to attorney's fees. As the prevailing party in this matter, which was a legal proceeding related to the contract, Morales Realty contends the trial court correctly granted its motion for summary judgment.

■ Generally, to enforce a contract, the person or entity seeking to enforce it must be either a party to the contract or a third-party beneficiary to it.[7] *See, e.g., In re El Paso Refinery, L.P.,* 302 F.3d 343, 353–54 (5th Cir.2002) (applying Texas law and holding nonparty to contract could not defend against contribution claims for environmental cleanup by relying on contract provision governing allocation of same between parties to contract); *Basic Capital Mgmt. v. Dynex Commercial, Inc.,* 254 S.W.3d 508, 515 (Tex.App.-Dallas 2008, pet. granted) (holding third-party stranger to contract may enforce its terms only if he was third-party beneficiary); *El Paso Community Partners v. B & G/Sunrise Joint Venture,* 24 S.W.3d 620, 626 (Tex. App.-Austin 2000, no pet.) (holding that generally someone who is not party to agreement has no interest in terms of agreement). Accordingly, before a court

---

**6.** Morales Realty also moved for summary judgment on the ground it was entitled to attorney's fees under the DTPA because Lesieur's suit was groundless, brought in bad faith, or brought for purposes of harassment. *See* Tex. Bus. & Com.Code Ann. § 17.50(c) (Vernon Supp. 2009) (stating that if trial court finds DTPA action was "groundless in fact or law or brought in bad faith, or brought for the purpose of harassment," the court shall award defendant reasonable and necessary attorney's fees and costs). However, Lesieur moved for summary judgment on this issue, and the trial court granted his motion. Morales Realty did not perfect an appeal nor has it raised a cross-point related to its request for fees under section 17.50(c). Therefore, we need only consider whether the trial court erred in granting attorney's fees to Morales Realty based on the contract between Lesieur and the Fryars.

**7.** There are, of course, exceptions to this rule. *See, e.g., In re Merrill Lynch Trust Co. FSB,* 235 S.W.3d 185, 194 (Tex.2007) (noting, in context of arbitration, Texas has long recognized nonparties may be bound to contract under traditional contract rules like agency or alter ego); *In re Weekley Homes,* 180 S.W.3d 127, 131–35 (Tex.2005) (holding that principles of equitable estoppel and agency may bind nonsignatories to arbitration agreement); *In re Kellogg Brown & Root,* 166 S.W.3d 732, 739 (Tex.2005) (holding nonsignatories may be bound to arbitration agreement under "direct benefits estoppel"). These exceptions, however, generally occur in the arbitration context, which is not applicable here.

construes a provision in the contract to determine whether it entitles the person or entity to relief, it must first determine whether the person or entity seeking to enforce the contract provision it is in fact a party or third-party beneficiary to the contract. Accordingly, before we determine whether Morales Realty is entitled to recover pursuant to the attorney's fees provision in the Farm and Ranch Contract, we must first find they are parties or third-party beneficiaries to it.

As to whether Morales Realty is an actual party to the contract, we hold the contract, by its terms, defines the parties to the contract as only the buyer and seller. *See Williamson v. Guynes,* No. 10–03–00047–CV, 2005 WL 675512, at *1 (Tex.App.-Waco Mar. 23, 2005, no pet.) (mem. op.). On the first page of the contract, the first paragraph provides:

> 1. PARTIES: *Timothy Fryar and Sandra Fryar* (Seller) agrees to sell and convey to *GEORGE LESIEUR AND DIANA LESIEUR* (Buyer) and Buyer agrees to buy from Seller the Property described below.

We interpret this provision of the contract as a definitional rather than merely a descriptive provision. Accordingly, the contract defines the parties as including only the Fryars as sellers and the Lesieurs as buyers. There is nothing else in the contract discussing or defining the parties.

Morales Realty points out that Gonzalez signed the contract. However, she did so only as the listing broker in a very specific portion of the contract. She did not sign the page where the buyer and the seller signed, nor did she initial any specific provision or page in the contract; rather, Gonzalez, as the listing broker, signed only that provision regarding the ratification of the broker's fee, thereby obligating her to pay Lesieur's broker three percent of the total sales price at closing.

With regard to third-party beneficiary status, there are two types of third-party beneficiaries who can enforce the terms of a contract, a donee or creditor beneficiary. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 651 (Tex.1999). "One is a donee beneficiary if the performance promised will, when rendered, come to him as a pure donation." *Id.* If the promised performance will come to him "in satisfaction of a legal duty owed to him," he is a creditor beneficiary. *Id.* There is a presumption against conferring third-party beneficiary status on noncontracting parties. *S. Tex. Water Auth. v. Lomas,* 223 S.W.3d 304, 306 (Tex. 2007) (citing *MCI Telecomms. Corp.,* 995 S.W.2d at 652); *see Energy Serv. Co. of Bowie, Inc. v. Superior Snubbing Servs., Inc.,* 236 S.W.3d 190, 199 (Tex.2007) (citing *Corpus Christi Bank & Trust v. Smith,* 525 S.W.2d 501, 503–04 (Tex.1975) (noting there is presumption that parties contract for themselves and not for third-party beneficiaries)). Therefore, any doubts as to whether a party is a third-party beneficiary are resolved against the existence of a third-party beneficiary. *Esquivel v. Murray Guard, Inc.,* 992 S.W.2d 536, 543 (Tex. App.-Houston [14th Dist.] 1999, pet. denied). In deciding whether a third party may enforce a contract between others, the contracting parties' intent controls. *Lomas,* 223 S.W.3d at 306 (citing *Corpus Christi Bank & Trust,* 525 S.W.2d at 503–04). The parties to the contract must intend to confer a direct benefit upon the alleged third-party beneficiary, and that intent "must be clearly and fully spelled out or enforcement by the thirty party must be denied." *Lomas,* 223 S.W.3d at 306 (quoting *MCI Telecomms. Corp.,* 995 S.W.2d at 651). The fact that incidental benefits may flow from a contract to a third party does not confer third-party beneficiary status on that party that would

allow him to enforce the contract. *Lomas,* 223 S.W.3d at 306 (citing *MCI Telecomms. Corp.,* 995 S.W.2d at 652). A third party may only enforce a contract when the parties to the contract "intend to secure some benefit for the third party and entered into the contract directly for the third party's benefit." *Lomas,* 223 S.W.3d at 306 (citing *MCI Telecomms. Corp.,* 995 S.W.2d at 651; *Stine v. Stewart,* 80 S.W.3d 586, 589 (Tex. 2002)).

■ In this case, there is no evidence to establish the Lesieurs and the Fryars intended to confer a direct benefit upon Cynthia Morales, doing business as Morales Realty, or Gonzalez. They clearly did not enter into the contract for the sale of the property directly for the benefit of the realtors. In fact, paragraph eight of the contract affirmatively belies the possibility that the Lesieurs and the Fryars intended to confer a direct benefit upon Cynthia Morales, doing business as Morales Realty, or Gonzalez. That paragraph is entitled "BROKERS' FEES" and states, "All obligations of the parties for payment of brokers' fees are contained in a separate written agreement." Accordingly, there was no intent the realtors directly benefit from the contract; rather, there was a separate agreement for their benefit. That the contract authorized the escrow agent to pay the brokers' fees directly from the closing proceeds does not establish a specific intent to secure a direct benefit; rather, that was merely an incidental benefit flowing from the contract, which *Lomas* held was insufficient to confer third-party beneficiary status.

Accordingly, we hold that because Morales Realty did not establish it was a party or third-party beneficiary to the contract, it was not entitled to rely on or enforce the attorney's fees provision. The trial court erred in granting summary judgment in favor of Morales Realty on its counterclaim for attorney's fees.

## CONCLUSION

Based on the foregoing we hold: (1) the trial court properly granted summary judgment in favor of the Fryars and Morales Realty on Lesieur's substantive claims; and (2) the trial court erred in granting summary judgment in favor of Morales Realty on its counterclaim for attorney's fees. Accordingly, we affirm the portion of the judgment granting summary judgment in favor of the Fryars and Morales Realty on Lesieur's substantive claims, and ordering that he take nothing, but reverse and render judgment that Cynthia Morales d/b/a Morales Realty and Cynthia Gonzales take nothing on their counterclaim for attorney's fees.

Dissenting opinion by: PHYLIS J. SPEEDLIN, Justice.

PHYLIS J. SPEEDLIN, Justice, dissenting.

The majority of the court reasons that the two inspection reports, the Adams Report and the NPI Report, say the same thing in different words, and therefore concludes that Lesieur's own pre-purchase inspection negates the elements of reliance and causation as a matter of law, warranting summary judgment on all of Lesieur's claims. I respectfully disagree because, while the majority correctly recites the applicable standard of review for a traditional summary judgment, it misapplies the standard to the evidence in this case.

To be entitled to a traditional summary judgment, a movant must show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law on a ground expressly stated in its summary judgment motion. Tex.R. Civ. P. 166a(c); *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 216

(Tex.2003). In conducting our *de novo* review of an order granting a traditional summary judgment motion, we must view the evidence, and all reasonable inferences therefrom, in the light most favorable to the non-movant, in this case in favor of Lesieur. *Id.* at 215–16. I believe the majority's analysis draws evidentiary inferences that favor the movants in reaching its conclusion that there is no disputed issue of material fact.

As more thoroughly described in the majority opinion, after Lesieur moved into his home in 2005, he began noticing signs of foundation problems. Upon discovering that he had not received a prior inspection report obtained by the Fryars in 2002, Lesieur brought suit against the Fryars and Morales Realty for fraud, negligence, negligent misrepresentation, DTPA violations, and civil conspiracy. The Fryars and Morales Realty sought summary judgment on several grounds, including that the elements of reliance and causation were negated as a matter of law because Lesieur had obtained his own independent inspection prior to his purchase. The trial court granted summary judgment in favor of the Fryars and Morales Realty. This appeal followed.

In affirming the summary judgment in favor of the Fryars and Morales Realty, the majority frames the relevant issue as "whether the Fryars and Morales Realty knew 'anything more or different' about the foundation based on the Adams Report, which was withheld from Lesieur, than Lesieur did based on his own inspection report." *See Lim v. Lomeli,* No. 04–06–00389–CV, 2007 WL 2428078, at *4 (Tex.App.-San Antonio Aug. 29, 2007, no pet.) (mem. op.) (holding that information from inspection report concerning defect was equally available to buyer, thereby negating causation and reliance as matter of law). After conducting a side-by-side comparison of the "Structural Systems" sections of the two reports, the majority states that "it is evident that the differences between the reports are merely a matter of word usage, not substance," and concludes the NPI Report provided Lesieur with the "same evidence of structural movement" as noted in the Adams Report. I respectfully disagree that the differences between the two reports are merely matters of word usage and not substance. While the language differences are clearly the result of word choice, they also convey a substantive difference in the existing defects found and the level of warning conveyed.

First, the verbiage used in the two inspection reports under "Structural Systems" is significantly different in at least two areas: (i) with regard to "structural movement" of the foundation; and (ii) with regard to a "visibly unlevel" floor. In the "Foundations" section of the Adams Report, the report received by the Fryars and Morales Realty in 2002, the inspector rendered a "Performance Opinion," expressly stating, "[s]igns of structural movement noted, however, the foundation is supporting the structure at this time." He listed the evidence of "structural movement" as: (i) cracks in walls and/or ceilings; (ii) door frames out of square; and (iii) cracks in brick/stone veneers. Clearly, the summary judgment evidence establishes the Adams inspector observed existing structural movement in 2002. This fact of existing "signs of structural movement" in 2002, along with the inspector's warning that the foundation was supporting the structure *"at this time,"* supports an inference that the structural movement could worsen in the future.

Even the majority agrees that the NPI Report, by contrast, does not contain an express finding of structural movement. In fact, the "Foundations" section of the

2005 NPI Report states that "no structural cracks were observed around the perimeter." The report does find "stress cracks" in the floor tile, as well as the grout joints, at the carport area and inside the house in spots. The NPI Report notes that, "[t]hese types of cracks *usually reflect* what is occurring on the slab itself" and "recommend[s] active monitoring" of the foundation. Comparing the two reports, not only is the wording facially different but the findings in the Adams Report are qualitatively stronger than those in the NPI Report. The use of the qualifier "usually" in the NPI Report is less affirmative, and provides a weaker warning to the buyer than the Adams Report's more affirmative conclusion that there were existing "signs of structural movement" in the foundation. Further, the NPI report limited its findings of "stress cracks" to only certain areas—the carport and "inside [the] house in spots." These differences alone create a factual issue precluding summary judgment. The majority explains away these substantive differences by finding, without supporting summary judgment evidence, that "cracking in the interior of a home is, axiomatically, the result of movement." The majority then concludes that the NPI observation of "stress cracks" is the equivalent of the Adams observation of "signs of structural movement." This reasoning ignores the NPI statement that there were "no structural cracks" observed around the perimeter. In concluding the reports' findings as to foundation are the same, the majority improperly draws inferences in favor of the movants.

With regard to the "Ceilings and Floor" section of the two reports, the Adams Report states, "the floors are visibly unlevel (front center bedroom)," while the NPI Report makes no mention of an unlevel floor. Instead, the NPI Report merely states that "stress cracks" were observed in the floor tile and grout joints inside the house in various spots. Again, comparing the two reports, not only is the wording facially different, but the Adams findings are substantively different than those in the NPI Report. A warning that the floor is "visibly unlevel" is more significant than that the floor tile has "stress cracks." Despite this express difference between the two reports, the majority concludes that no fact issue exists as to whether the Fryars and Morales Realty knew anything more or different than Lesieur based on the undisclosed Adams Report. The majority infers that, "if a floor was 'visibly unlevel,' he [Lesieur] would have had personal knowledge of it based on his walk-through" of the home prior to his purchase. The majority reaches this conclusion in favor of the movants despite the lack of summary judgment evidence to support the inference. In fact, to the contrary, in his deposition Lesieur testified that he did a final walk-through of the property before closing, but saw nothing that caused him any "alarm or concern."

The majority bolsters its conclusion that the two inspection reports are the same by noting that neither inspector checked the box requiring immediate repair of the foundation. Accordingly, the majority draws the inference from the absence of a check mark that "neither inspector believed the home's foundation was currently unsound or in a state of disrepair." While both inspectors checked the box showing the foundation had been "Inspected," rather than the box showing the foundation was "Not Functioning or In Need of Repair," there is no summary judgment evidence explaining the criteria used, or the weight to be given to checked or unchecked boxes in the presence of written findings. As discussed *supra*, there are substantive differences in the inspectors'

affirmative written findings as to the foundation.

Finally, even if I were to agree that the two inspection reports are the "same," or equivalent, there was additional summary judgment evidence presented as to Lesieur's knowledge and reliance that the majority does not consider. Lesieur's affidavit states he had no knowledge of the prior home inspection by Adams before the closing, and if he had known about the 2002 Adams inspection prior to his purchase he "would have had serious concerns about the condition of the home." Specifically, Lesieur states he "would have had the foundation inspected," and if he had "known the home had foundation problems, [he] would not have purchased it." In addition, in his deposition, Lesieur testified that when he viewed the property with the realtor he noticed "a couple of cracks in the tile," but "figured they were probably moving furniture, that they had dropped the furniture on it and that made it crack," or the cracks were due to "improper laying of the cement beneath the tile." To repair the cracked tiles, Lesieur agreed the sellers could simply supply replacement tiles. Lesieur testified that he "relied very heavily on the seller's disclosure ... [which] specified that there was no problem with foundation or interior walls or floors." Lesieur also relied on his own independent inspector, who found no foundation problems. Specifically, Lesieur stated he relied on his inspector's finding that there were "no structural cracks" around the perimeter; he did not have any discussions with the inspector about what he meant by that statement. This additional summary judgment evidence, when viewed in the light most favorable to Lesieur, raises fact issues that (i) Lesieur relied on the sellers' representations there were no foundation problems and no previous inspections, and (ii) if Lesieur had seen the Adams Report, and known about its express finding of "structural movement" in the foundation, he would have acted differently. Lesieur's affidavit and deposition testimony is some evidence that he was assured there were no previous inspections and no existing foundation problems, and he relied on those assurances by the Fryars and Morales Realty in proceeding with the purchase of the property. Other summary judgment evidence shows the Fryars and Morales Realty did have more knowledge than Lesieur prior to the closing because they knew about the prior Adams Report and its findings with regard to structural movement of the foundation. Cf. Lim, 2007 WL 2428078, at *4 (holding there was no evidence that the seller knew the home suffered from greater defects than revealed in the inspection reports and withheld such knowledge from the buyers).

In summary, I believe that a material fact question exists on the elements of causation and reliance. Specifically, I disagree with the majority's conclusion that the differences between the two inspection reports are minor, non-substantive differences of word choice that do not raise a disputed fact issue. The finding of "signs of structural movement" in the foundation stated in the Adams Report at least creates a fact question as to whether the first inspection report provided a stronger warning than the NPI Report which noted only "stress cracks" in the floor tiles and "no structural cracks" around the perimeter. The Adams report finds an existing structural defect in the foundation, although it did not require immediate repair, while the NPI Report affirmatively finds there are "no structural cracks," only stress cracks. Likewise, the observation in the Adams Report that one bedroom had "visibly unlevel" floors at least creates a fact question as to whether that first inspection report was more thorough, or possibly more accurate, than the second

report by NPI, which noted only "stress cracks" in the tile floor inside the house and made no mention of unlevel floors. I would hold that the relevant portions of the two inspection reports are sufficiently different, and thus create a fact question as to whether Lesieur had less knowledge than the Fryars and Morales Realty; therefore, the elements of causation and reliance are not negated as a matter of law. Consequently, I would hold the trial court erred in granting summary judgment on that basis.