

# NUMBER 13-20-00167-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**RICHARD URIBE,**        **Appellant,**

**v.**

**BRIAR-RIDGE, LLC,**        **Appellee.**

## On appeal from the 197th District Court
## of Cameron County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Silva
Memorandum Opinion by Justice Benavides**

On November 18, 2021, we issued our memorandum opinion and judgment in this case. Appellant Richard Uribe has filed a motion for rehearing, and we requested a response from appellee Briar-Ridge, LLC. We deny the motion. However, we withdraw our prior opinion and judgment and issue the following memorandum opinion and

accompanying judgment in their place.

In this commercial real estate dispute, the trial court granted a partial directed verdict in favor of appellee Briar-Ridge, LLC[1] on appellant Richard Uribe's claims for fraudulent inducement and statutory fraud. On appeal, Uribe contends that both claims should have been submitted to the jury because they were supported by legally sufficient evidence. We affirm.

## I. BACKGROUND

### A. The Lease

In July 2016, Uribe agreed to lease from Briar-Ridge a standalone commercial building in San Benito, Texas for the purpose of opening a restaurant. As part of the negotiated terms, Briar-Ridge agreed to contribute $40,000 towards an estimated $79,877 in remodeling costs, abate the rent for five months, include an option to purchase, and assume certain maintenance and repair obligations. In return, Uribe agreed to pay the balance of the remodeling costs, pay $4,600 a month for sixty months, pay property taxes and insurance premiums for the premises during the same term, and to assume certain other maintenance and repair obligations. The lease commenced on August 1, 2016, the first payment was due on January 1, 2017, and the lease term expired on December 31, 2021.

The commercial lease agreement, based on a form promulgated by the Texas Association of Realtors, also contains the following provisions:

---

[1] In its original answer and counterclaim, appellee alleged that it was misnamed in the petition and that its proper name is Briar-Ridge, Inc., not Briar-Ridge, LLC. Uribe did not amend his petition to reflect this purported error, so we will refer to appellee by the name contained in Uribe's live pleading and the final judgment.

2

**10. LEGAL COMPLIANCE:**

. . . .

C. [Briar-Ridge] does not represent or warrant that the leased premises or Property conform to applicable restrictions, zoning ordinances, setback lines, parking requirements, impervious ground cover ratio requirements, and other matters that may relate to [Uribe]'s use. [Uribe] must satisfy itself that the leased premises may be used as [Uribe] intends by independently investigating all matters related to the use of the leased premises or Property. [Uribe] agrees that it is not relying on any warranty or representation made by [Briar-Ridge], [Briar-Ridge]'s agent, or any broker concerning the use of the leased premises or Property.

. . . .

**13. MOVE-IN CONDITION:** [Uribe] has inspected the leased premises and accepts it in its present (as-is) condition unless expressly noted otherwise in this lease or in an addendum. [Briar-Ridge] and any agent have made no express or implied warranties as to the condition or permitted use of the leased premises of Property.

The "as-is" provision is not modified by any other provision in the lease. The lease also includes the following addendum: "[Briar-Ridge] and [Uribe] hereby agree and understand that [Uribe] shall have the option to purchase this property on a mutually agreed to fair market value prior to the termination of this lease provided [Uribe] gives [Briar-Ridge] 90 days['] notice prior to the termination of the lease."

**B.     Uribe Files Suit and Briar-Ridge Countersues**

The contractor originally estimated that it would take "60 days to make repairs and have [the] restaurant in working order and up to code." The remodel took much longer and cost much more than the original estimate, and the parties disagreed about who should bear these costs. Uribe contended that during the remodel, he uncovered undisclosed defects in the condition of the property that were structural in nature, and

therefore, under the terms of the lease, Briar-Ridge was responsible for these repairs. Briar-Ridge countered that it had satisfied all its obligations under the lease and that Uribe was responsible for completing the remodel, including the payment of any overages.

On June 21, 2017, Briar-Ridge sent Uribe a letter notifying him that he was in default under the lease and demanding rent payment for the months of January, February, March, April, May, and June 2017. Uribe filed suit soon after, claiming breach of contract, breach of the implied warranty of suitability, fraudulent inducement, statutory fraud, negligent misrepresentation, estoppel, and seeking declaratory relief.

Briar-Ridge filed a general denial, asserting various affirmative defenses, including the defense that Uribe leased the premises "as is." Briar-Ridge also countersued for breach of contract and declaratory relief.

## C. The Trial

Uribe, forty-five years old at the time of trial, testified that he had worked primarily in the restaurant industry since he was sixteen. After working cumulatively for thirteen to fourteen years in the fast-food industry, rising to the position of general manager over three Jack-in-the-Box locations, a proprietor asked him to be the general manager of a local restaurant. Uribe, already considering opening his own restaurant at that point, decided to accept the position so that he could learn how to run a small business, as opposed to the corporate franchises he had managed in the past. As Uribe explained it, he brought structure to the local restaurant, and in turn, the proprietor taught him how to be an entrepreneur.

During his tenure as general manager, the restaurant opened a second location in

another city, and Uribe was heavily involved in the new enterprise: "So I did everything from the banking to—to the purchase of the property, involved in the negotiation of the property, buying the property." Uribe was also involved in "the design of the building" at the second location.

After managing the local restaurants for approximately fifteen years, Uribe decided to open his own business. When looking at possible locations, Uribe said that potential ownership of the building was an important consideration. He knew the property in question had been a restaurant in the past and was vacant at the time. Uribe contacted a real estate broker, Connie De La Garza, who acted as an intermediary between Uribe and Briar-Ridge.

After Uribe and Briar-Ridge expressed mutual interest in reaching an agreement, Uribe and his contractor met with Briar-Ridge's president, Bill Weekly, at the location to conduct a walk-through. Uribe explained that he told the contractor to "really look at it and tell [him] what it needs . . . so [he] can get it opened." In turn, the contractor provided Uribe with a two-page "proposal for upgrades" that was attached to the lease as an exhibit.

According to Uribe, Weekly told him during the walk-through that the property was a "functioning restaurant." However, Uribe also acknowledged that the property was "very dated" and that many of the commercial grade appliances, like the exhaust hoods and walk-in freezer, would need to be replaced. When asked what specifically he inspected before signing the lease, Uribe responded, "Well, I mean, gas, you know, water, you know, basic necessities to run it, electricity."

[Attorney]: And so in that meeting where you reviewed the property, you were able to see the parts of the building that you would need fixed, correct?

[Uribe]: I saw cosmetic things that I would want to fix, you know, as a cosmetic. But as a functioning, whether or not the water turned on or not, or, you know—

Uribe also acknowledged that he was provided with a key to the building to continue his inspection, but other than the initial two-hour walk-through with his contractor and Weekly, he did not return to the building or have it professionally inspected before signing the lease:

[Attorney]: Actually, weren't you given a key where you could continue to go in there day after day?

[Uribe]: Afterwards, yes.

[Attorney]: So you could have inspected for over the next week, if you wanted to?

[Uribe]: Sure. Absolutely.

[Attorney]: Okay. You weren't deprived of any opportunity to inspect. You could inspect all you want; true?

[Uribe]: Correct.

Uribe said that, in exchange for remodeling the property, he initially asked for a twelve-month rent abatement "[b]ecause that's standard in real estate." Briar-Ridge counteroffered with a five-month rent abatement and a contribution of $40,000 towards the $79,877 in estimated remodeling costs. Uribe testified that he also agreed to a higher rent in exchange for Briar-Ridge assuming certain maintenance and repair obligations that would normally fall to the tenant in a commercial lease. De La Garza prepared the lease agreement in accordance with the terms agreed to by the parties.

6

Uribe testified that during the remodel, he discovered several defects in the condition of the property that had not been disclosed by Briar-Ridge. The first "was a big fire in the restaurant." According to Uribe, he discovered fire damage after removing the exhaust hoods, and at that point, he noticed "the trusses were burned, electrical was shot, it was all burnt." In his opinion, "[t]here's no way I could have told you, or the contractor, anybody could have told you that there was a fire . . . before." It was undisputed that charring was visible on the rafters, less than four feet from the entrance to the attic. Uribe said his contractor did go in the attic, but he was unsure whether the contractor used a flashlight or "had a good look at it or not."

Uribe also testified that a wall had to be completely replaced because it was "warped" and "rotted from water damage." According to Uribe, the water damage was due to a leak in the roof and a leak in a water line that runs through the attic. There is no evidence that Uribe had the roof inspected before signing the lease. Weekly testified that the water damage was readily apparent during the walk-through, saying it looked as if someone had mopped the wall and that "everybody could see that." Uribe did not dispute Weekly's account.

Uribe said that as the remodel was nearing completion, he discovered an issue with the plumbing when "the toilets wouldn't flush." Further investigation revealed a leak in the plumbing and that the property's sewer line was not connected to the city's line; instead, it was emptying into the grass at the front of the property. During cross-examination, Uribe acknowledged that a provision in the lease provides that "Tenant should determine if all necessary utilities are available to the leased premises and are

7

adequate for Tenant's intended use." There is no evidence that Uribe had a plumber conduct an inspection before signing the lease.

Finally, Uribe also testified that the entire parking lot had to be replaced at a cost of approximately $90,000. Uribe conceded that he and his contractor did not examine the parking lot during the walk-through because it was dark outside.

Uribe discussed his expectations about the condition of the property when he signed the lease:

> [N]othing has been maintained in the building. If I'd known that, it just would have been different. But I had certain expectations of things working, and they weren't. And we're talking about basic, basic things, not stuff that I want because I wanted to make it look nice or I want it pretty. It needs to work.

When asked why he did not conduct a more thorough investigation, Uribe said he "relied on" the reputation of the realtor and Briar-Ridge as "reputable" and "ethical."

When asked how he reacted to the discovery of the defects and the need for additional remodeling, Uribe said, "I was okay with it, because it's—it's—my understanding, it's a 40-year-old building, it's not new construction." He added, "I was fully aware" that issues may arise. Uribe said he showed Weekly what he deemed to be "structural" damage to the building and asked Briar-Ridge to pay for the additional work but that Weekly refused. Uribe stated that he felt comfortable signing the lease, including paying substantially more than the prior tenant, because, based on his understanding of the agreement, Briar-Ridge accepted responsibility for repairing and maintaining any structural problems with the building.

It was undisputed that the lease assigned certain repair and maintenance obligations to Briar-Ridge, including "[f]oundation, exterior walls, roof, and other structural

8

components" and "[p]arking areas and walks." The parties disagreed, however, about when those obligations commenced. According to Briar-Ridge, they did not begin until Uribe completed the buildout, and any structural issues that arose during the remodel were Uribe's responsibility. According to Uribe, Briar-Ridge was responsible for maintaining and repairing these items from day one of the lease, regardless of whether the buildout was ongoing. Ultimately, this question was submitted to the jury by agreement of the parties, and the jury found that it was the parties' mutual intent that the landlord's repair obligations under the lease would begin after the remodeling of the restaurant was complete. Based on this finding, the jury did not reach the question of whether Briar-Ridge breached its obligation to maintain and repair the foundation, exterior walls, roof, and other structural components. Uribe has not challenged the jury's findings on appeal.

Weekly testified that he never made any representation about whether the building could function as a restaurant. Instead, Weekly claimed that he told Uribe that he had "no idea what works and what doesn't work." He said the inclusion of the disclaimer-of-reliance and "as is" provisions in the lease were "[v]ery important" to him "because [he] could make no representations about the building."

To aid Uribe in his remodeling efforts, Briar-Ridge returned Uribe's first month's rent and deposit. Weekly said that Briar-Ridge contributed at least an additional $68,756.47 above the $40,000 it agreed to contribute under the terms of the lease. This amount included paying insurance premiums and property taxes that were Uribe's obligation under the lease. It was undisputed that after Briar-Ridge returned the first

9

month's rent, Uribe never made another rent payment to Briar-Ridge, even after Uribe opened his restaurant in August of 2018.[2] Briar-Ridge's bookkeeper testified that Uribe owed Briar-Ridge a total of $180,762.12 for unpaid rent, insurance premiums, and property taxes.

## D.    The Directed Verdict

On the second day of trial, after hearing arguments from both sides, the trial court declared the purchase option unenforceable, explaining that it was nothing more than an "agreement to agree." The next day, after both sides rested, Briar-Ridge moved for a directed verdict on "all the fraud claims." After considering the parties' arguments, the trial court announced that it was finding the "as is" provision in the lease enforceable. Ultimately, none of Uribe's fraud claims were submitted to the jury, only the parties' respective breach of contract claims.

## E.    The Judgment

The jury returned a verdict in favor of Briar-Ridge on its breach of contract claim and against Uribe on his breach of contract claim, awarding Briar-Ridge $180,762.12 in actual damages. The parties thereafter agreed to submit the question of attorney's fees to the trial court, and the court awarded Briar-Ridge $181,988.75 in attorney's fees through trial, as well as conditional attorney's fees for successfully defending the judgment on appeal. After entry of the judgment, this appeal ensued.

---

[2] In October 2018, the trial court ordered Uribe to pay monthly rent into the registry of the court "until the trial of the merits in this cause." The same order contains a trial setting for February 18, 2019. After that date passed, Uribe stopped making payments into the registry of the court because he believed he had satisfied his obligations under the order. The trial commenced in January 2020.

## II. STANDARD OF REVIEW & APPLICABLE LAW

A motion for a directed verdict is a procedural device that asks the court to render judgment without submitting the case to the jury because there is nothing for the jury to decide. *C.B. v. Tex. Dep't of Fam. & Protective Serv.*, 440 S.W.3d 756, 769 (Tex. App.—El Paso 2013, no pet.). A defendant is entitled to a directed verdict when there is no evidence of a fact essential to the plaintiff's claim or the evidence conclusively negates the plaintiff's right of recovery. *Prudential Ins. Co. of Am. v. Financial Rev. Servs.*, 29 S.W.3d 74, 77 (Tex. 2000) (citing *Latham v. Castillo*, 972 S.W.2d 66, 67–68, 70–71 (Tex. 1998); *Villegas v. Griffin Indus.*, 975 S.W.2d 745, 748–49 (Tex. App.—Corpus Christi–Edinburg 1998, pet. denied)).

When reviewing a directed verdict, "our task, as an appellate court, is to determine whether there is any evidence of probative force sufficient to raise a fact issue on the material questions presented." *Daniels v. Allsup's Convenience Stores, Inc.*, 604 S.W.3d 461, 465 (Tex. App.—Amarillo 2020, pet. denied) (citing *Collora v. Navarro*, 574 S.W.2d 65, 68 (Tex. 1978)). We consider all the evidence in the light most favorable to the party against whom the verdict was directed and disregard all contrary evidence and inferences. *Id.*; *Encina P'ship v. Corenergy, L.L.C.*, 50 S.W.3d 66, 68 (Tex. App.—Corpus Christi–Edinburg 2001, pet. denied). If we find that reasonable minds could differ as to the truth of the controlling facts, then an issue of fact exists, and that issue should be submitted to the jury. *Daniels*, 604 S.W.3d at 465. We are not bound by the movant's arguments or the trial court's reasoning for granting the directed verdict; instead, we may affirm the verdict on any ground supported by the record. *Encina*, 50 S.W.3d at 68.

11

"Fraudulent inducement is a species of common law fraud" that arises only in the context of a contract: a person may not use a fraudulent misrepresentation to induce another to enter a contract. *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018) (citing *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001)). The basic elements of fraud must be established as they relate to an agreement between the parties: (1) a material misrepresentation, (2) made with knowledge of its falsity or asserted without knowledge of its truth, (3) made with the intention that it should be acted on by the other party, (4) which the party relied on, and (5) which caused injury. *Id.* (citing *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015)). Actionable misrepresentations include a failure to disclose material information where a legal duty to disclose such information exists (i.e., fraud by nondisclosure) and a false promise made with a present intent not to perform. *Id.* (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998) (op. on reh'g)); *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001).

The elements of statutory fraud are essentially the same as those of fraudulent inducement, but the claim is specific to a contract involving real estate or stock, and the plaintiff need not prove the defendant's knowledge of falsity or recklessness to recover actual damages. *See* TEX. BUS. & COM. CODE ANN. § 27.01(a)–(c). A lease agreement with an option to purchase is a transaction involving real estate for purposes of statutory fraud. *Wise v. Pena*, 552 S.W.2d 196, 198, 202 (Tex. App.—Corpus Christi–Edinburg 1977, writ dism'd) *partially overruled on other grounds by Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 678 (Tex. 2000).

12

## III.    FAILURE TO DISCLOSE

By his first issue, Uribe argues that there was legally sufficient evidence to support his claim for fraudulent inducement based on Briar-Ridge's failure to disclose material facts about the condition of the property that were not discoverable by the exercise of ordinary care and due diligence, or which a reasonable investigation and inquiry would not have uncovered. *See Smith v. Nat'l Resort Cmtys., Inc.*, 585 S.W.2d 655, 658 (Tex. 1979) (recognizing that "a seller of real estate is under a duty of disclosing material facts which would not be discoverable by the exercise of ordinary care and diligence on the part of the purchaser, or which a reasonable investigation and inquiry would not uncover"). In particular, Uribe argues on appeal that Briar-Ridge failed to disclose "structural deficiencies in the building[,] including those related to sewage, previous structural fire damage, structural water damage, and [the] foundation."

The trial court concluded that the "as is" provision in the lease negated the causation element of Uribe's fraudulent inducement claim as a matter of law. *See Prudential Ins. Co. of Am. v. Jefferson Assocs.*, 896 S.W.2d 156, 161 (Tex. 1995) ("A valid 'as is' agreement, like the one in this case, prevents a buyer from holding a seller liable if the thing sold turns out to be worth less than the price paid because it is impossible for the buyer's injury on account of this disparity to have been caused by the seller."). Uribe argues on appeal that the clause is unenforceable because Briar-Ridge induced him to lease the property "as is" by fraudulently concealing material defects in the condition of the property. *Id.* at 162 ("A buyer is not bound by an agreement to purchase something 'as is' that he is induced to make because of a fraudulent representation or

13

concealment of information by the seller."). Other aspects of the transaction should also be weighed in determining the enforceability of an "as is" agreement, including disclaimer-of-reliance language in the clause, how important the clause was to the bargain, and the relative bargaining positions of the parties. *Id.*

We need not address the issue of whether the "as is" clause is enforceable, though, because the evidence in the record conclusively establishes that Uribe could have discovered the defects by exercising ordinary care, namely, by conducting a reasonable inspection of the property.[3] *See Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 497 (Tex. 2019) ("We recognize a long-standing principle that a 'party claiming fraud has a duty to use reasonable diligence in protecting his own affairs'— specifically that '[i]n an arm's-length transaction the defrauded party must exercise ordinary care for the protection of his own interests and is charged with knowledge of all facts which would have been discovered by a reasonably prudent person similarly situated.'" (alteration in original) (quoting *Thigpen v. Locke*, 363 S.W.2d 247, 251 (Tex. 1962))); *Italian Cowboy Partners v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 339 (Tex. 2011) ("The persistent odor problem did not appear until a layer of solidified grease was removed from the grease trap, meaning that a reasonable inspection of the premises by Italian Cowboy would not have revealed the problem.").

---

[3] At trial, Briar-Ridge vigorously denied any prior knowledge of the defects. *See Prudential Ins. Co. of Am. v. Jefferson Assocs.*, 896 S.W.2d 156, 162 (Tex. 1995) ("A seller has no duty to disclose facts he does not know. . . . Nor is a seller liable for failing to disclose what he only should have known." (citing *Robinson v. Preston Chrysler–Plymouth, Inc.*, 633 S.W.2d 500, 502 (Tex. 1982); *Ozuna v. Delaney Realty, Inc.*, 600 S.W.2d 780, 782 (Tex. 1980) (per curiam))). Uribe argues on appeal that there was sufficient circumstantial evidence to raise a reasonable inference that Briar-Ridge was aware of the defects but nonetheless remained deliberately silent. Because Uribe failed to present legally sufficient evidence of another element of its fraudulent inducement claim, we do not reach this sub-issue. *See* TEX. R. APP. P. 47.1.

14

There are several facts that inform our conclusion that Uribe did not exercise ordinary care to protect his interests under the circumstances. "[A] plaintiff may not 'blindly rely on a representation by a defendant' when the plaintiff's knowledge, experience, and background alert it to investigate the defendant's representation before acting in reliance on those representations." *Barrow-Shaver*, 590 S.W.3d at 497 (quoting *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 654 (Tex. 2018)). Uribe acknowledged during his testimony that he was "fully aware" that the building was "40 years old" before he signed the lease and that based on the building's age and his substantial experience managing restaurants, he expected repair and maintenance issues to arise over the course of the lease. Uribe also acknowledged that, unlike a residential lease, most repair and maintenance obligations fall to the tenant in commercial leases. That was certainly the case here. Although Uribe negotiated some concessions in this area, he was still responsible for repairing and maintaining fourteen out of the eighteen designated categories in the lease, including plumbing systems, electrical systems, and HVAC systems.

Additionally, between the monthly rent of $4,600 and the estimated monthly expenses for taxes and insurance premiums of $1,226.23, Uribe committed himself to a minimum obligation of $349,573.80 over the sixty-five-month term of the lease.[4] On appeal, Uribe himself describes the length of the lease as "shocking." Finally, regardless of its eventual enforceability, the inclusion of an "as is" provision in a commercial lease would put a prudent tenant on notice that a careful inspection of the premises is necessary

---

[4] As previously mentioned, the rent was abated for the first five months of the lease; therefore, ($4,600 + $1,226.23) × 60 = $349,573.80.

before signing the lease. *See Gym-N-I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 914 (Tex. 2007) ("By agreeing to lease property 'as is,' a lessee agrees to make his own appraisal of the bargain and accepts the risk that he may misjudge its value." (citing *Prudential*, 896 S.W.2d at 161)). In short, by agreeing to lease this premises under these terms, Uribe exposed himself to considerable risks.

Despite these known risks, Uribe's only "inspection" of the building occurred during a two-hour walk-through with his contractor—at nighttime. He did not have the premises professionally inspected, as commonly occurs in residential purchases where, like Uribe, the buyer is making a significant financial commitment. *See, e.g.*, *Lesieur v. Fryar*, 325 S.W.3d 242, 246 (Tex. App.—San Antonio 2010, pet. denied) (holding that causation and reliance elements of fraud claim were conclusively defeated when buyer's independently obtained inspection report contained same information about foundation issues as report sellers failed to disclose); *Ritchey v. Pinnell*, 324 S.W.3d 815, 819 (Tex. App.—Texarkana 2010, no pet.) (holding fraud claim was not precluded where buyer hired an inspector but the inspection did not reveal the complained of defect). Whatever its form, to exercise ordinary care, Uribe's inspection had to be "reasonable" under the circumstances. *Italian Cowboy*, 341 S.W.3d at 339. We conclude that it was not.

Although Uribe claimed during his testimony that several of the defects were undiscoverable until he began remodeling the building, he also acknowledged that he and his contractor were focused on cosmetic aspects of the building during the walk-through, not its functionality. Regardless, Uribe's conclusory statement is contrary to the evidence. *See Anderson v. Snider*, 808 S.W.2d 54, 55 (Tex. 1991) (per curiam) (explaining

16

conclusory statements alone are not legally sufficient evidence). According to Uribe, he first discovered the issue with the sewer line when "the toilets wouldn't flush." Obviously, there was nothing preventing Uribe from testing the toilets during the walk-through. *See Robbins v. Capozzi*, 100 S.W.3d 18, 25 (Tex. App.—Tyler 2002, no pet.) (holding seller was entitled to summary judgment on buyer's fraud claim because "[h]ad [buyer] exercised ordinary care and due diligence by attempting to park her vehicle in either of the garages before the closing date, she would have discovered that she could not turn her vehicle into the garages"). And while nonfunctioning toilets may not have revealed the full extent of any defects in the sewer line, testing them during the walk-through would have put Uribe on notice that further investigation of the plumbing was necessary before signing the lease. *See Barrow-Shaver*, 590 S.W.3d at 497. Similarly, Uribe admitted that he did not inspect the parking lot because it was dark outside. This repair alone accounted for approximately seventy-five percent of the additional costs above the contractor's estimate. Finally, it was undisputed that the water damage was visible during the walk-through and that the fire damage was visible on rafters less than four feet from the entrance to the attic. Uribe himself said that the wall was "warped" from the water damage, and he could not say whether his contractor had a flashlight or "had a good look at [the attic] or not." Simply put, these were not latent defects; instead, as Uribe put it, these were "basic, basic things" that needed to be repaired.

Uribe has never argued or presented evidence that Briar-Ridge frustrated his ability to inspect the property. *Cf. Jefferson Assocs.*, 896 S.W.2d at 162 (recognizing that an "as is" provision is not enforceable where buyer's ability to inspect the property is

17

impaired by the seller). To the contrary, Uribe acknowledged that he was provided with a key to the building so that he could return in the daylight and continue his inspection. He chose not to. When asked why he did not conduct a more thorough inspection, Uribe said he "relied on" the reputation of the real estate broker and Briar-Ridge as "reputable" and "ethical." However, a party in an arm's length transaction must exercise ordinary care for the protection of his own interests, and any failure to do so will not be excused "by mere confidence in the honesty and integrity of the other party." *Barrow-Shaver*, 590 S.W.3d at 497 (quoting *Thigpen*, 363 S.W.2d at 251).

Having failed to exercise ordinary care under the circumstances, Uribe is charged with knowledge of the defects in the condition of the premises. *See id.* Thus, as a matter of law, Uribe cannot establish that he justifiably relied on Briar-Ridge's failure to disclose material defects in the condition of the property, and Briar-Ridge was entitled to a directed verdict on this claim. *See id.* We overrule Uribe's first issue.

## IV.    OPTION TO PURCHASE

Alternatively, Uribe argues that both his fraudulent inducement and statutory fraud claims were supported by legally sufficient evidence that (1) his decision to enter the lease was largely based on the agreement's inclusion of the purchase option, and (2) Briar-Ridge had no intention of selling the property to him when the lease was executed.

"[A] fraud claim can be based on a promise made with no intention of performing, irrespective of whether the promise is later subsumed within a contract." *Formosa Plastics*, 960 S.W.2d at 46. However, "[w]ithout a binding agreement, there is no detrimental reliance, and thus no fraudulent inducement claim." *Haase*, 62 S.W.3d at 799.

18

An agreement to agree is unenforceable. *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) ("It is well settled law that when an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree." (quoting *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000))).

Here, the purchase option provides that Uribe "shall have the option to purchase this property on a *mutually agreed to* fair market value prior to the termination of this lease." (Emphasis added). The trial court declared the purchase option an unenforceable agreement to agree, thereby foreclosing the purchase option as a basis for Uribe's fraudulent inducement or statutory fraud claims. *See Haase*, 62 S.W.3d at 799.

On appeal, Uribe hinges his alternative fraud theories on the purchase option, yet he fails to address the trial court's declaration that the option is unenforceable. Because we may affirm a directed verdict on any ground supported by the record and Uribe has the burden to discredit each basis for Briar-Ridge's directed verdict, Uribe has waived any error related to the trial court's directed verdict on these claims, and we must affirm the trial court's ruling. *See Encina*, 50 S.W.3d at 68 ("A reviewing court may affirm a directed verdict even if the trial court's rationale for granting the directed verdict is erroneous, provided the verdict can be supported on another basis." (citing *Villarreal v. Art Inst. of Hous.*, 20 S.W.3d 792, 796 (Tex. App.—Corpus Christi–Edinburg 2000, no pet.))); *McKelvy v. Baker*, 381 S.W.2d 59, 62 (Tex. 1964) (failing to address all grounds raised in directed-verdict motion waives complaint); *Guynn v. Corpus Christi Bank & Tr.*, 589 S.W.2d 764, 770 (Tex. App.——Corpus Christi–Edinburg 1979, writ dism'd) (same); *see*

19

*also Vawter v. Garvey*, 786 S.W.2d 263, 264 (Tex. 1990) (per curiam) (concluding appellate court erred in reversing judgment on grounds raised by court sua sponte); *McCoy v. Rogers*, 240 S.W.3d 267, 272 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (stating, in context of summary judgment, that a court "must affirm when a judgment may have been rendered, whether properly or improperly, on a ground not challenged on appeal"). Uribe's second issue is overruled.

## V.    CONCLUSION

We affirm the trial court's judgment.

GINA M. BENAVIDES
Justice

Delivered and filed on the
29th day of December, 2021.

20