**Opinion issued October 31, 2024**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-22-00707-CV

————————————

**JEFFREY HAMMOND AND CALLIE HAMMOND, Appellants**

**V.**

**CRISTA L. HANSER, JEFFREY W. CONNELL, MICHAEL W. CLAPP, DSJMM, LLC AND FLUTOBO, INC. D/B/A KELLER WILLIAMS REALTY NORTHEAST, Appellees**

---

**On Appeal from the 269th District Court**
**Harris County, Texas**
**Trial Court Case No. 2019-67684**

---

## MEMORANDUM OPINION

Appellants Jeffrey and Callie Hammond purchased a home from appellee Crista L. Hanser. After discovering problems with the home, the Hammonds sued Hanser and appellees Jeffrey W. Connell (Hanser's real estate agent), Michael W.

Clapp (Connell's supervising broker), and Flutobo, Inc. doing business as Keller Williams Realty Northeast (Connell's brokerage agency) (collectively, the Listing Agents).[1] The Hammonds alleged causes of action for negligence and gross negligence, negligent misrepresentation, common-law fraud and fraud by nondisclosure, statutory fraud in the sale of real estate, violation of the Texas Deceptive Trade Practices Act (DTPA), and civil conspiracy and aiding and abetting against Hanser and the Listing Agents, and they also alleged breach of contract against Hanser. Hanser and the Listing Agents both moved for traditional and no-evidence summary judgment on all of the Hammonds' claims. The trial court granted the summary judgments, dismissing all of the Hammonds' claims with prejudice.

On appeal the Hammonds assert that the trial court "erred in granting the two final summary judgment motions," arguing that (1) the trial court erred in granting summary judgment in Hanser's favor on all of the Hammonds' causes of action against her; (2) the trial court erred in granting summary judgment in favor of the Listing Agents on all of the Hammonds' causes of action against them; and (3) the trial court erred in sustaining Hanser's objections to certain summary-judgment exhibits.

---

[1] The Hammonds also named DSJMM, LLC, as a defendant, but this entity was later non-suited and is not a party to this appeal.

2

Because we conclude that the trial court's summary judgments were proper, we affirm.

## Background

### A. Relevant Facts

The property in question is a four-story home located at 411 West 17th Street in Houston, Texas (the Property). It was built in 2011 by InTown, Ltd. The exterior of the free-standing Property is covered in stucco siding. After purchasing the Property directly from InTown, Hanser lived there until July 2017. When Hanser needed to relocate for work, she listed the Property for sale through Connell. Connell and Hanser had been dating, and he spent some time in the Property in the course of their relationship.[2]

The Hammonds agreed to purchase the Property in the fall of 2017. Hanser completed a "Seller's Disclosure Notice" using the form promulgated by the Texas Real Estate Commission (TREC). The TREC disclosure contains the following language:

> This notice is a disclosure of seller's knowledge of the condition of the property as of the date signed by seller and is not a substitute for any inspections or warranties the buyer may wish to obtain. It is not a warranty of any kind by seller, seller's agents, or any other agent.

---

[2] Hanser and Connell eventually married in 2018. He disclosed his relationship with Hanser to the Hammonds at the time of the sale.

Hanser marked that she was not occupying the Property at the time she completed the Seller's Disclosure Notice, and she had not occupied the Property since July 15, 2017. She signed the Seller's Disclosure on August 17, 2017.

In Section 2 of the TREC Seller's Disclosure Notice, Hanser marked that she was not "aware of any defects or malfunctions" in various components of the Property, including in the "exterior walls" or "other structural components." Section 3 of the Seller's Disclosure Notice asked, "Are you (Seller) aware of any of the following Conditions?," and Hanser marked "No" for "water penetration" and "wood rot" among other conditions. Section 4 of the Seller's Disclosure Notice asked, "Are you (Seller) aware of any item, equipment, or system in or on the Property that is in need of repair, which has not been previously disclosed in this notice?" Hanser did not identify any items in need of repair.

The Hammonds acknowledged their receipt of the Seller's Disclosure on September 26, 2017. The Hammonds and Hanser also entered into a "One to Four Family Residential Contract (Resale)" containing an as-is provision. The contract, completed on a form promulgated by the TREC, provided that Hanser was obligated to permit the Hammonds access to the Property and to permit inspections. It also provided that the Hammonds agreed to accept the Property "As Is," which the contract defined:

> As Is means the present condition of the Property with any and all defects and without warranty except for the warranties of title and the

warranties in this contract. Buyer's agreement to accept the Property As Is under [this paragraph] does not preclude Buyer from inspecting the Property [as provided in this paragraph], from negotiating repairs or treatments in a subsequent amendment, or from terminating this contract during the Option Period, if any.

The contract contained two options—(1) "Buyer accepts the Property As Is"; and (2) "Buyer accepts the Property As Is provided Seller, at Seller's expense, shall complete the following specific repairs and treatments[.]" The contract was marked, "(1) Buyer accepts the Property As Is."

The Hammonds also obtained an inspection of the Property from Fox Inspection Group before the sale closed. The inspection report from Fox did not identify any major concerns. The report stated, in relevant part, "A limited visual inspection of what appears to be traditional hard coat/cement-based stucco exterior siding did not indicate any specific areas of concern for this inspector." The inspection report further stated, "However, no representation is made regarding the lack of or possibility of unseen/undetected/hidden/latent water damage behind the stucco exterior." The report encouraged the Hammonds to arrange for a separate "stucco intrusive inspection prior to the expiration of any option period" if they had concerns. The inspector recommended "adding cap flashing at all exposed stucco walls," stating that the "[p]otential for water penetration is very high if left unprotected." The inspector also pointed out the lack of a "weep screed" that

would "provide a means for moisture to exit from behind the stucco if the wall assembly leaks."

The inspection report noted that the "Walls (Interior and Exterior)" were "inspected" and found "deficient." The inspector noted that "[n]o moisture, mold and/or indoor air quality (IAQ) tests were performed," and stated, "If concerned the client is advised to contact a qualified IAQ Professional for further evaluations of this property." The report specifically identified concerns with "holes/openings in garage walls and/or ceilings"; "nail heads . . . pushing through the interior finish" in places; "[w]ater stains, damage or repairs observed, moisture detection equipment indicated that stains are not active (wet) at time of inspection; kitchen windows," but "[m]oisture meter registers water stains as active; in master closet at baseboards. Inspector unable to determine cause." It also noted that there was no evidence of water penetration present at the time of inspection.

Finally, the inspection report identified several other areas of concern regarding things like the "cooling system," which the inspector believed might not be adequate for the house and was "[n]ot cooling well" and had a "very rusted" secondary drain pan in need of replacement. The report pointed out the need for additional grout or caulk in bathrooms "to prevent water entry behind wall." And it pointed out concerns about "[o]ne or more [electrical] outlets [that are] not secure well in wall."

The Hammonds followed up with Hanser regarding some of the items identified in the Fox inspection report. In an email, they asked:

> 2. Moisture was discovered near the baseboard in the master bedroom closet (but not in the wall/ceilings). Is the seller aware of what might have cause[d] this? Was there a plumbing leak, glass of water spilled in the closet, etc.?
>
> 3. Did the seller do any repair work to the stucco (e.g. kitchen window) prior to recently painting it?

Hanser responded through her agent, Connell, in an email dated October 1, 2017:

> As for your questions regarding the window over the sink, the seller states that was simply due to the settling of the house and the only repair there was light sanding and paint.
> The other spot in the master closet is a mystery. Possibly wet clothes left too long from a beach weekend or the like. There has "never" been a plumbing leak.
> As far as the stucco, there has "never" been a major stucco repair; cracks from settling were filled as part [of] bi-yearly stucco maintenance the seller did religiously and a complete new $7k paint job done this summer. The stucco paint should be beautiful for at least another five years per the painter and paint specs.

On October 15, 2017, the Hammonds signed the "Buyer's Walk-Through and Acceptance Form." They marked that the Property "was inspected by an inspector or inspectors of Buyer's choice. Buyer has reviewed the inspection report(s)." They also marked that they had "walked through and reviewed the Property before closing on 10.15.2017." The form provided that "Buyer accepts the Property in its present condition." And it contained the following notice:

7

The brokers have no knowledge of any defects in the Property other than what has been disclosed in the Seller's Disclosure Notice or other written information the brokers may have provided. The brokers have no duty to inspect the property for unknown defects. It is the Buyer's responsibility to have inspections completed.

The sale of the Property closed on October 16, 2017, with the Hammonds paying $531,500 for the Property.

The Hammonds allege that, a few months after they moved into the Property, they began to notice staining above the garage and mold in the master bath fan. They also noticed multiple neighbors making repairs to the stucco on their properties. This prompted the Hammonds to have an inspection of the stucco. James Morgan of Lone Star Stucco, LLC conducted an assessment and detected "substrate damage throughout the home, delamination from the stucco wall, and separated and penetrated sealants in many areas." Based on this inspection and various estimates obtained from contractors to remediate and repair the issues with the Property, the Hammonds assert that the total cost of repairs would be $109,254.08.

## B.    Procedural History

The Hammonds filed suit against Hanser and the Listing Agents. They later amended their petition to sue InTown for construction defects. The Hammonds subsequently settled with InTown and dismissed InTown from the suit. In the live pleading, the Hammonds alleged causes of action for negligence and gross

8

negligence, negligent misrepresentation, common-law fraud and fraud by nondisclosure, statutory fraud, DTPA violations, and civil conspiracy and aiding and abetting against Hanser and the Listing Agents, and for breach of contract against Hanser only. The Hammonds sought actual and exemplary damages plus attorney's fees.

Hanser and the Listing Agents filed separate motions for no-evidence and traditional summary judgment. Hanser moved for summary judgment on the basis that she made no misrepresentations or failures to disclose because she was not obligated to disclose information she did not know. Hanser also argued that the Hammonds had no evidence on one or more essential elements on each claim alleged against her. She further asserted that the elements of causation or reliance in the Hammonds' various claims are negated by the valid "as is" clause in the sale contract and the Hammonds' own independent inspection of the Property. Thus, she argued that the evidence conclusively established no genuine issue of material fact on an essential element of each of the Hammonds' claims.

The Listing Agents moved for summary judgment on the grounds that there was no evidence to support the Hammonds' negligence claim against them and no evidence that any of the Listing Agents' actions or omissions breached any legal duties to the Hammonds. The Listing Agents further moved for traditional summary judgment, arguing that the evidence established that the Listing Agents

9

identified known issues with the Property prior to purchase, the Hammonds obtained their own inspections, and they accepted the Property "as is" at the time of sale. The Hammonds completed the "Buyer's Walk-Through and Acceptance Form" that states that "The Brokers have no duty to inspect the property for unknown defects. It is the Buyer's responsibility to have inspections completed." The Listing Agents also pointed out that, in addition to conducting their own visual inspection of the Property, the Hammonds were permitted to conduct any inspections they desired. Their own inspector did not identify any issues that raised concerns for them.

The Hammonds responded to both motions, asserting that they were fraudulently induced into purchasing the Property and that Hanser and the Listing Agents engaged in deceptive trade practices, among other claims. In support of their response, the Hammonds presented their own affidavits recounting the details of the sale and their discovery of defects in the Property after purchase, the contract and Seller's Disclosure Notice, the Fox Inspection Report, evidence of repairs to other homes in same neighborhood as the Property, and expert reports and cost estimates regarding the condition of the Property. These reports and estimates included a July 11, 2018 estimate from Monolite Stucco Systems for stucco repair totaling $56,960 and estimates for dealing with mold and other remediation. It also included Morgan's report on behalf of Lone Star Stucco

10

confirming "substrate damage throughout the home, delamination from the stucco wall, and separated and penetrated sealants in many areas, and specifically noted "substrate damage" in "the bottom of the bumpout wall below the kitchen windows." Morgan suggested having "a qualified stucco waterproofing contractor repair in an effort to prevent moisture intrusion."

The summary judgment evidence included the report of Linda Lauver, who conducted an interior mold inspection of the Property at the Hammonds' request and observed a water stain and previous repairs to the ceiling drywall in the master closet "due to past roof leaks" and relative humidity readings in the master closet of up to 59%. Another expert who identified "excessive water intrusion" and observed that "the original construction lacked effective weatherproofing and flashing," leaving the Property to rely "on secondary caulking to keep water out." That expert stated, "As the caulking has aged, the underlying defects have become more apparent and it is expected that much of the exterior of the structure is affected."

The Hammonds also introduced evidence of previous repairs to the Property, including evidence that Hanser submitted repair requests or "warranty tickets" to InTown regarding cracks in the stucco that were repaired by InTown following Hanser's requests. These include (1) a June 3, 2012 request stating that "[t]here are cracks on the exterior due to settling" and accompanying evidence that InTown

11

"came out and fixed the cracks"; (2) a December 28, 2012 request stating that "[t]here are several cracks outside the stucco on the balcony and upstairs on the roof deck" and additional evidence that InTown did repair work; and (3) the June 26, 2013 request stating that "[t]he house is absorbing an abnormal amount of water and is causing the stucco to crack beyond what is acceptable for a home not yet two years old" and that Hanser had received an estimate of $6,700 from a paint company to repair the stucco and additional evidence that InTown made repairs.

The Hammonds also provided receipts for HVAC repairs or maintenance done by Hanser through 2015 and 2016. And they provided evidence that Hanser hired painters to address the small cracks and paint the stucco. When asked about this in her deposition, Hanser stated, "Again what I remember the most is, you know, the cracks on the—on the front of the house and perhaps above the garage." Hanser testified that she was told that these cracks were due to settling, and she believed that the repair and paint work addressed the issue.

The summary-judgment record contained additional deposition testimony of Hanser herself, who testified that she was not aware of any problems with the stucco at the time she sold the Property. She was not aware of problems with water penetration or wood rot, or any of the other concerns identified by the Hammonds after they had moved into the Property. Hanser testified that she believed the repairs identified by the Hammonds, whether through the warranty tickets

12

submitted to InTown or through her own contractors, had been completed. She specifically testified that she was told by InTown and other contractors that the cracks in the stucco were due to settling. She testified that she had a forensic structural engineer check the Property's foundation in 2013 "to make sure that it is not the reason for the cracks." She reported that the engineer told her the Property was "structurally sound," and she did not need to be concerned because the small cracks "were normal."

At the hearing on the Listing Agents' motion for summary judgment, they first addressed their no-evidence motion. They pointed out, among other issues, that the Hammonds had not alleged any acts or omissions by Clapp or Flutobo, only by Connell. They also pointed out that, regarding Connell's liability, the Hammonds had not identified any evidence that Connell knew or should have known something about the condition of the Property that he failed to disclose, arguing that the Hammonds have only made "conclusory claims, circumstantial guessing that because [Connell and Hanser] were dating, he should have known something was wrong with the house, when [the Hammonds'] own inspectors didn't even" identify the concerns alleged by the Hammonds.

In response, the Hammonds argued that Connell circumstantially knew or should have known about the problems with the Property because he dated Hanser and therefore knew about the previous repairs she made to the home. They asserted

13

that Connell also would have been aware that some of Hanser's neighbors also engaged in stucco repairs. Counsel for the Hammonds stated, "I'm leaving out gobs of other tidbits that we couldn't possibly go through, hundreds of little pieces of evidence, all of which is in the summary[-]judgment record of which a jury could easily infer actual knowledge at trial, but at the very least there is a genuine issue of material fact." The trial court responded that it would need additional time to review the motion, response, and evidence, stating, "part of my issue with . . . your filed response is there is a lot of evidence attached and just a bare minimum of connecting of the dots between the causes of action and what's attached."

Relevant to her motion for summary judgment, Hanser objected to some of the evidence the Hammonds filed with their response to the motions for summary judgment. She objected to the admissibility of the "warranty tickets" and a receipt for some repairs done by InTown on the Property—the paperwork purportedly showing Hanser's requests for repairs to the Property under the builder's warranty program and a payment to one of InTown's contractors. The Hammonds asserted that they obtained these documents from InTown, but no affidavit of business records or other authentication was provided for these warranty tickets. As such, Hanser argued that, because the documents lacked proper authentication, they contained inadmissible hearsay and should be struck. Hanser made similar objections based on unauthenticated exhibits containing inadmissible hearsay

14

regarding emails from Connell, photos of the Property, and seller's disclosure notices for neighboring properties. The trial court sustained most of Hanser's objections to the evidence.

The trial court granted both motions for summary judgment and rendered separate summary-judgment orders, dismissing all of the Hammonds' claims with prejudice. The trial court then denied the Hammonds' motion for new trial. This appeal followed.

## Summary Judgment

The Hammonds argue on appeal that the trial court erred in granting summary judgment in favor of Hanser and the Seller's agents.

### A.     Standard of Review

We review summary judgments de novo. *City of Richardson v. Oncor Elec. Delivery Co.*, 539 S.W.3d 252, 258 (Tex. 2018). When, as here, the trial court grants summary judgment without specifying the grounds for granting the motion, we must affirm its judgment if any one of the grounds is meritorious. *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 680 (Tex. 2017).

Hanser and the Listing Agents moved for summary judgment on both traditional and no-evidence grounds. When reviewing grounds for summary judgment, we take as true all evidence favorable to the Hammonds and indulge every reasonable inference and resolve any doubts in the Hammonds' favor.

15

*Sommers for Ala. & Dunlavy, Ltd. v. Sandcastle Homes, Inc.*, 521 S.W.3d 749, 754 (Tex. 2017).

On the traditional grounds, the movants bore the burden of showing that no genuine issue of material fact exists and that the trial court should grant judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Oncor Elec.*, 539 S.W.3d at 258–59. To do so, the defendant movants must conclusively negate at least one essential element of each of the plaintiffs' causes of action or conclusively prove all the elements of an affirmative defense. *KCM Fin., LLC v. Bradshaw*, 457 S.W.3d 70, 79 (Tex. 2015). If the movant establishes it is entitled to summary judgment, the burden shifts to the non-movant to raise a genuine issue of material fact to defeat the summary judgment. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995).

On the no-evidence grounds, the movants must identify one or more essential elements of each of the causes of action for which there was no evidence. TEX. R. CIV. P. 166a(i); *Cmty. Health*, 525 S.W.3d at 695–96. To defeat the no-evidence grounds, the Hammonds had to adduce more than a scintilla of evidence raising a genuine issue of material fact. *See KCM Fin.*, 457 S.W.3d at 79.

Generally, when parties move for summary judgment on both traditional and no-evidence grounds, we first consider the no-evidence motion for summary judgment. *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45

(Tex. 2017). But, if the movant in a traditional motion challenges a cause of action on an independent ground, we consider that ground first because it would be unnecessary to address whether a plaintiff met its burden as to the no-evidence challenge if the cause of action is barred as a matter of law. *Tex. Petroleum Land Mgmt., LLC v. McMillan*, 641 S.W.3d 831, 840 (Tex. App.—Eastland 2022, no pet.); *Lotito v. Knife River Corp.-S.*, 391 S.W.3d 226, 227 n.2 (Tex. App.—Waco 2012, no pet.) (considering traditional motion for summary judgment first because no-evidence motion for summary judgment was "premised on a determination that the traditional motion sought to defeat as a matter of law").

## B. Hanser's Motion for Summary Judgment

In their first issue, the Hammonds challenge the trial court's rendition of summary judgment in Hanser's favor. In her traditional motion for summary judgment, Hanser argued that the Hammonds were not entitled to recover on any of their causes of action against her because they purchased the Property "as is," and thus, as a matter of law, they could not establish the required causation or reliance to support any of their claims. In her no-evidence motion, Hanser argued, in relevant part, that the Hammonds produced no evidence that she made an actionable misrepresentation to them. Because Hanser's traditional ground based on the as-is purchase of the Property is dispositive, we analyze that portion of her summary judgment motion first.

17

### 1. *"As-Is" Purchase*

"A buyer who purchases property 'as is' chooses 'to rely entirely upon his own determination' of the property's value and condition without any assurances from the seller." *Williams v. Dardenne*, 345 S.W.3d 118, 123 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (quoting *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995)); *MacPherson v. Aglony*, No. 09-21-00004-CV, 2022 WL 4374998, at *11 (Tex. App.—Beaumont Sept. 22, 2022, no pet.) (mem. op.) (holding that buyer who purchases something "as is" agrees to make his own appraisal of bargain and accepts risk that he may be wrong). "'The seller gives no assurances, express or implied, concerning the value or condition of the thing sold[,]' and the buyer chooses to rely completely on his own determination of the condition and value of the purchase, removing the possibility that the seller's conduct will cause him damage." *MacPherson*, 2022 WL 4374998, at *11 (quoting *Rohrs v. Hartz*, No. 09-19-00196-CV, 2021 WL 2677422, at *12 (Tex. App.—Beaumont June 29, 2021, no pet.) (mem. op.), and *Prudential Ins. Co.*, 896 S.W.2d at 161).

Whether an as-is clause is enforceable is a question of law we review de novo. *See Prudential Ins. Co.*, 896 S.W.2d at 161. "In assessing the enforceability of an as-is clause, courts consider the totality of the circumstances surrounding the agreement." *Van Duren v. Chife*, 569 S.W.3d 176, 185 (Tex. App.—Houston [1st

18

Dist.] 2018, no pet.) (citing *Gym-N-I Playgrounds v. Snider*, 220 S.W.3d 905, 912 n.10 (Tex. 2007) and *Prudential Ins. Co.*, 896 S.W.2d at 162). An as-is clause generally is enforceable if it was a significant part of the basis of the bargain, rather than an incidental or boilerplate provision, and if it was entered into by parties of relatively equal bargaining position. *Id.*

Here, the Hammonds and Hanser entered into a "One to Four Family Residential Contract (Resale)" containing an as-is provision. The contract, completed on a form promulgated by the TREC, provided that the Hammonds agreed to accept the Property "As Is," which the contract defined as meaning "the present condition of the Property with any and all defects and without warranty except for the warranties of title and the warranties in this contract." The Hammonds also signed a form indicating that they completed a walk-through of the Property the day before closing and accepted the Property in its present condition.

The sale contract here is a standard form promulgated by the TREC that brokers generally must use in homes sales. *See Van Duren*, 569 S.W.3d at 186 (citing 22 TEX. ADMIN. CODE § 537.11 and analyzing similar contract). Because the form provided the parties with two options as to the acceptance of the Property's condition—either "as is" or "as is provided Seller . . . shall complete . . . specific repairs and treatments"—we conclude it was a significant part of the basis

19

of the bargain and not an incidental or boilerplate provision. This Court has previously held that "[a] mandatory form contractual provision that requires the parties in any given transaction to choose from two or more options is by definition negotiable and not boilerplate." *Id.* at 187 (citing BLACK'S LAW DICTIONARY 167 (7th ed. 1999) (defining "boilerplate" as "[f]ixed or standardized contractual language that a proposing party views as relatively nonnegotiable")); *see also Sims v. Century 21 Cap. Team*, No. 03-05-00461-CV, 2006 WL 2589358, at \*3 (Tex. App.—Austin Sept. 8, 2006, no pet.) (mem. op.) (holding that provision in form contract promulgated by TREC that required parties to fill in blanks was not boilerplate). Furthermore, the Hammonds do not argue or present any evidence indicating that there was any disparity in relative bargaining position. *See Van Duren*, 569 S.W.3d at 186. Thus, we conclude that the as-is provision here was valid. *See id.*

Nevertheless, "[t]wo scenarios may render a valid as-is clause unenforceable": (1) when "sellers secure an agreement to an as-is clause through false assurances about the value or condition of the thing being sold or by the concealment of information as to its value or condition" or (2) when "sellers impair or obstruct" the buyer's right to inspect the property. *Id.* at 185–86 (citing *Prudential Ins. Co.*, 896 S.W.2d at 161–62, *Williams*, 345 S.W.3d at 124–25); *MacPherson*, 2022 WL 4374998, at \*11–12. Buyers challenging the enforceability

20

of an as-is clause bear the burden of presenting evidence as to at least one of these exceptions. *Hall v. Rogers*, No. 01-19-00408-CV, 2021 WL 2653736, at * 5 (Tex. App.—Houston [1st Dist.] June 29, 2021, pet. denied) (mem. op.).

The Hammonds presented no evidence that Hanser obstructed their right to inspect the Property, and the summary-judgment evidence indicates that the Hammonds obtained an inspection and conducted their own walk through of the Property prior to the closing of the sale. The Hammonds argue, however, that Hanser made misrepresentations or omissions about the condition of the Property that induced them into the purchase.

### 2. *No Evidence of Fraudulent Inducement*

To prove that they were fraudulently induced into agreeing to the as-is provision, the Hammonds must show that "the defendant made a material misrepresentation; the defendant was either aware that the representation was false or that he lacked knowledge of its truth; the defendant intended for the plaintiff to rely on the misrepresentation; the plaintiff relied on the misrepresentation; and the plaintiff's reliance caused injury." *Pogue v. Williamson*, 605 S.W.3d 656, 665–66 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (citing *Int'l Bus. Mach. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228 (Tex. 2019)); *Van Duren*, 569 S.W.3d at 188 ("To show fraudulent inducement . . . the [buyers] must show that [the seller]

made a false material representation, knew it was false when made, intended to induce reliance, and did induce reliance.").

Here, the Hammonds argue that they were fraudulently induced or deceived into purchasing the Property "as is," "only to learn later that due to stucco and exterior construction defects, the home needed $109,254.08 in remediation and repairs." They further assert that "misrepresentations . . . permeated the sales process," pointing out that Hanser "checked 'no' to the box on the seller's disclosure notice about water penetration issues and did not indicate anything in the blank about systems in need of repair." The Hammonds also argue that, in response to questions they asked after their home inspection, Hanser provided information in the October 1, 2017 email that she did not know what caused water spots in the primary bedroom closet, but there had been no plumbing leaks and there were no major stucco repairs. But the Hammonds then discovered "serious water intrusion and exterior stucco problems" that "date back to construction of the home."

The Hammonds thus identify two different representations by Hanser that they allege were actionable misrepresentations: (1) Hanser's statements in the Seller's Disclosure, and (2) Hanser's statements, made through Connell, in the October 1, 2017 email. Hanser asserted in her motion for summary judgment that

22

the Hammonds provided no evidence that either of these statements were knowing misrepresentations, and we agree.

Regarding Hanser's statements in the Sellers' Disclosure, the Hammonds point to Hanser's responses that she was not "aware of any defects or malfunctions" in various components of the Property, including in the "exterior walls" or "other structural components." Hanser also marked that she was not aware of conditions such as "water penetration" or "wood rot." Hanser did not identify any items or systems in need of repair in the section asking, "Are you (Seller) aware of any item, equipment, or system in or on the Property that is in need of repair, which has not been previously disclosed in this notice?"

The Hammonds argue in their brief that they construed Hanser's representations in the Seller's Disclosure "to mean that the property did not have any current material issues or problems and did not have any in the past." This argument misconstrues that nature of Hanser's representations in the Seller's Disclosure.

Property Code section 5.008 requires a seller of residential real property to give the purchaser of the property a written notice—the "Seller's Disclosure Notice"—disclosing the seller's knowledge of the condition of the property. TEX. PROP. CODE § 5.008(a); *MacPherson v. Pena*, 2022 WL 17685119, at *7 (Tex. App.—Beaumont Dec. 15, 2022, no pet.) (mem. op.). The Seller's Disclosure

23

Notice itself makes it clear that the representations within are statements of the seller's knowledge of the condition of the property: "This notice is a disclosure of seller's knowledge of the condition of the property as of the date signed by seller and is not a substitute for any inspections or warranties the buyer may wish to obtain. It is not a warranty of any kind by seller, seller's agents, or any other agent." *See Pena*, 2022 WL 17685119, at *7 & n.18 (considering representations in Seller's Disclosure Notice based on same TREC form).

Hanser's Seller's Disclosure did not represent that there were no defects in the Property; rather, her representations in the Seller's Disclosure indicated that Hanser did not know of any defects in the Property at the time she completed the notice. The Hammonds have provided no evidence that, contrary to her representations in the Seller's Disclosure, Hanser knew of then-existing defects that she failed to disclose. They cited evidence of previous repairs that Hanser made to the Property, including requests for repair that she made to InTown, the builder. The Hammonds argue that this evidence indicates that there were problems of long duration despite Hanser's failure to disclose them.

However, "evidence of repairs without more does not show that a person knows a defect still exists in a home." *Id.* at *7. While a seller must disclose "material facts which would not be discoverable by the exercise of ordinary care and diligence on the part of the purchaser, or which a reasonable investigation and

inquiry would not uncover," a seller has no duty to disclose facts that he does not know. *MacPherson*, 2022 WL 4374998, at *11 (citing *Smith v. Nat'l Resort Cmtys., Inc.*, 585 S.W.2d 655, 658 (Tex. 1979)). Stated another way, "A seller has no duty to disclose facts he [or she] does not know. Nor is a seller liable for failing to disclose what he [or she] only should have known." *Hall*, 2021 WL 2653736, at *6 (quoting *Prudential Ins. Co.*, 896 S.W.2d at 162).

In addition, a seller is not required to disclose any knowledge of past conditions on the property which are not known to exist at the time the Seller's Disclosure Notice is signed. *Hall*, 2021 WL 2653736, at *6 (citing *Bynum v. Prudential Residential Servs., Ltd. P'ship*, 129 S.W.3d 781, 795 (Tex. App.—Houston [1st Dist.] 2004, pet. denied), and *Van Duren*, 569 S.W.3d at 189). "Knowledge of past repairs does not establish knowledge of a present defect[.]" *Van Duren*, 569 S.W.3d at 188 (holding that knowledge of leak that was repaired, without more, does not support inference of knowledge of existing defect). "Thus, a seller has no duty to disclose a condition or defect which was previously repaired or remedied." *Hall*, 2021 WL 2653736, at *6; *see Pfieffer v. Ebby Halliday Real Estate, Inc.*, 747 S.W.2d 887, 890 (Tex. App.—Dallas 1988, no writ) ("[R]epairs correct defects, not prove their continued known existence.").

The Hammonds argued, "When the very problems that were denied in a seller's disclosure statement manifest themselves shortly after closing, that is

strong evidence of deception." They cite *Sigler v. Durbec*, No. 05-98-01207-CV, 2001 WL 432620 (Tex. App.—Dallas Apr. 30, 2001, no pet.) (mem. op., not designated for publication), and *Kessler v. Fanning*, 953 S.W.2d 515 (Tex. App.—Fort Worth 1997, no pet.), to support their contention that the problems that manifest after closing constituted some evidence that Hanser knew about problems with the house she did not disclose. These cases are distinguishable.

In *Sigler*, the seller told the buyer that there had been a roof leak, but it had been repaired and there were no leaks. 2001 WL 432620, at *1. The seller disclosed no defects or malfunctions with the roof. *Id.* However, the first time it rained after the buyers moved into the house, the roof leaked in several places resulting in damage to the buyers. *Id.* The buyers presented testimony from a person who inspected the roof and offered his opinion that the roof was "now leaking and has been leaking for some time," stating, "There is no way for this roof to not be leaking." *Id.* at *4. He also testified that when he examined the inside of the home, he observed places where damage from leaks had been painted over and that the people who lived in the home would have heard the drips and seen and smelled the damage from the leaks. *Id.* The court in *Sigler* determined that this evidence was sufficient to overcome the seller's no-evidence motion for summary judgment on the buyer's DTPA claim. *Id.*

Similarly, in *Kessler*, the buyer's identified drainage problems "almost immediately" after moving into the house. 953 S.W.2d at 517, 521. One of the buyers testified that the seller "admitted to her that the house had a problem with improper drainage and he was aware of it." *Id.* at 521. The buyers also presented an expert's opinion that the drainage problem had existed for "at least three years," and a neighbor testified that he had observed the drainage problems while the sellers had lived on the Property. *Id.* at 522. Thus, the *Kessler* court determined that the evidence was sufficient to support the trial court's decision to submit to the jury the issue of liability under the DTPA. *Id.*

*Sigler* and *Kessler* are different from the present case in several material ways. First, neither *Sigler* nor *Kessler* involved an as-is purchase or fraudulent inducement, but violations of the DTPA. *See* 2001 WL 432620, at *1, 7; 953 S.W.2d at 518–19, 521; *see also Prudential Ins. Co.*, 896 S.W.2d at 162–63 (holding, in context of analyzing as-is sale of property, that evidence that seller "should have suspected the presence of asbestos" is not sufficient to show misrepresentation because seller must only disclose actual knowledge of conditions, and observing that seller "had no duty to investigate the presence of asbestos in the [Property], or to disclose to [the buyer] any general concerns it may have had about asbestos in buildings"). Furthermore, although the Hammonds presented some evidence that the problems with the stucco were present from the

time the house was built, they did not provide any evidence that the nature of those problems would have been obvious to Hanser, in contrast to the expert testimony offered in *Sigler* and *Kessler*. Thus, *Sigler* and *Kessler* do not compel the conclusion here that the nature of the problems with the Property constituted some evidence that Hanser made knowing misrepresentations to induce them into the as-is sale of the Property.

The Hammonds also argue that the fact that Hanser had the house painted the summer before she sold the Property "without addressing or repairing the stucco and water intrusion problems leads to the ineluctable conclusion that she intended to secrete them." The Hammonds argue that covering defects, rather than repairing them, is a sign of deception. There is no evidence here, however, that Hanser knew there were water penetration problems or that she painted the house to cover up any defects. The Hammonds point, in part, to the results of a penetrative stucco test conducted after they moved in that showed there was "substrate damage throughout the home, delamination from the stucco wall, and separated and penetrated sealants in many areas." Hanser, however, testified in her deposition that she believed the cracks addressed as part of the paint job were cosmetic or attributable to settling. There is no evidence that the paint job covered up "substrate damage," "delamination," or "separated and penetrated sealants in many areas."

The Hammonds cite *Fernandez v. Schultz*, 15 S.W.3d 648 (Tex. App.—Dallas 2000, no pet.) to support their contention, but that case in distinguishable. In *Fernandez*, Fernandez purchased the property after another potential purchaser backed out when their inspector found evidence of active termites. *Id.* at 650. Fernandez hired a contractor to repair the home so that it could be resold, and the contractor noticed signs of active termites. *Id.* The contractor testified that he informed Fernandez about the termites and that Fernandez told him to make only cosmetic repairs to cover the termite damage. *Id.* Fernandez then sold the home to Shultz based on his seller's disclosure notice marking "no" with regard to whether he had any knowledge regarding active termites, termite damage, or previous termite treatment. *Id.* The court in *Fernandez* found this evidence to constitute more than a scintilla of evidence to support Fernandez's liability to Shultz under the DTPA. *Id.* at 651–52.

Here, however, no such evidence exists. The Hammonds have not presented any evidence that a contractor or other party informed Hanser about problems with the stucco or water penetration. Nor did they present any evidence of repairs that concealed or hid problems with the stucco or water penetration. Specifically, there was no evidence that the exterior paint job—disclosed to the Hammonds in the October 1, 2017 email—served to conceal the defects the Hammonds now complain about. *See, e.g.*, *Hall*, 2021 WL 2653736, at *6; *Van Duren*, 569 S.W.3d

29

at 189 (holding that evidence of previous repairs and maintenance do not prove actual knowledge of defects at time of completing required disclosures).

We conclude that the Hammonds have presented no evidence that Hanser made a knowing misrepresentation in the Seller's Disclosure that would invalidate the as-is clause.

The Hammonds also contend that Hanser misrepresented the condition of the Property in her October 1, 2017 email. In that email, Hanser, through her agent Connell, related information to the Hammonds that the repairs around the kitchen window were "simply due to settling of the house and the only repair there was light sanding and paint" and that there had been no "major stucco repair," only cracks from settling that were "filled as part [of] bi-yearly stucco maintenance the seller did religiously and a complete new $7k paint job done this summer." Also in this email, Connell conveyed that the wet spot in the closet was "a mystery" and was "possibly [caused by] wet clothes left too long from a beach weekend or the like," and that there had never been a plumbing leak. The Hammonds argue that this email "served to defraud the Hammonds out of exercising the option to terminate the purchase-sale agreement."

However, as with the representations in the Seller's Disclosure, the Hammonds presented no evidence that Hanser's statements regarding the window repair, the stucco maintenance, the "mystery" water spot in the closet, or the lack

of any plumbing leaks were false when she made them, as required to support an allegation of fraudulent inducement. *See Van Duren*, 569 S.W.3d at 188 ("To show fraudulent inducement . . . the [buyers] must show that [the seller] made a false material representation, knew it was false when made, intended to induce reliance, and did induce reliance.").

The Hammonds cite *Bernstein v. Thomas*, 298 S.W.3d 817 (Tex. App.—Dallas 2009, no pet.) to support their argument that "when the seller gives assurances about matters raised in an inspection report, that diffuses any effect the report has against reliance and causation." We observe, however, that contrary to the situation in *Bernstein*, Hanser's representations in the October 1, 2017 email are not affirmative representations that there was no defect or malfunction. *See id.* at 823 ("Although the Bernsteins contend they did not impede the Thomases' inspection of the foundation in any way, the jury could have reasonably concluded from the evidence presented that the Bernstein's assurances about the condition of the house, and their specific representation that there was no defect or malfunction in the foundation, played a part in dissuading the Thomases from further investigation."). As compared to a "specific representation that there was no defect," as in *Bernstein*, Hanser's representations were limited to her own knowledge of the Property's condition.

31

Hanser stated that the window repair was "simply due to settling of the house and the only repair there was light sanding and paint" and that there had been no "major stucco repair," only cracks from settling that were "filled as part [of] bi-yearly stucco maintenance the seller did religiously and a complete new $7k paint job done this summer." There is no evidence that any of these statements were false. There was no evidence that Hanser knew there was any continuing problem following the repair to the kitchen window or routine stucco maintenance. Additionally, Hanser represented that the water spot in the closet was "a mystery" and that there had not been any plumbing leaks. Again, the Hammonds presented no evidence that these representations were false or that Hanser actually knew about any water penetration issues when she made these representations.

Because the Hammonds failed to meet their burden to bring forward any evidence of fraudulent inducement, we conclude that the as-is provision in the sale contract is valid and enforceable.

### 3. *Enforceable As-Is Clause Negates Causation*

By purchasing the home pursuant to an enforceable as-is clause, the Hammonds agreed to make their own appraisal of the bargain and to accept the risk as to the quality of the Property and any resulting loss. *See MacPherson*, 2022 WL 4374998, at *11–12. Thus, the enforceable as-is clause negates causation or reliance in the Hammonds' claims for (1) negligence, *see Van Duren*, 569 S.W.3d

32

at 185 (holding that causation is necessary element of negligence claim and negated by valid, enforceable as-is clause) (citing *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004)); (2) gross negligence, *see Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006) (requiring proof of proximate cause for gross negligence claims); (3) negligent misrepresentation, *see Van Duren*, 569 S.W.3d at 185 (holding that reliance is essential element of claim for negligent misrepresentation (citing *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 693 (Tex. 2002)); (4) breach of contract, *see MacPherson*, 2022 WL 4374998, at *11 (concluding that as-is clause negated causation required to establish breach-of-contract claim); (5) common-law fraud, *see Int'l Bus. Machs.*, 573 S.W.3d at 228 (justifiable reliance is element of common-law fraud); (6) fraud by nondisclosure, *see Van Duren*, 569 S.W.3d at 185 (holding that reliance necessary element of fraud by nondisclosure and negated by as-is clause), (7) statutory fraud in the sale of real estate, *see* TEX. BUS. & COM. CODE § 27.01(a) (elements include reliance on false representation); and (8) DTPA violations, *see Prudential Ins. Co.*, 896 S.W.2d at 160–61 (holding that valid as-is clause negates causation required for DTPA claim); *see also* TEX. BUS. & COM. CODE § 17.50(a) (providing that claims brought under DTPA require showing of "producing cause").

We therefore conclude that the trial court's summary judgment in favor of Hanser on the Hammonds' claims for negligence, gross negligence, negligent misrepresentation, common-law fraud and fraud by nondisclosure, statutory fraud in sale of real estate, violation of the DTPA, and breach of contract was supported by the presence of the enforceable as-is clause.

## C.    Listing Agents' Summary Judgment

In their second issue, the Hammonds argue that the trial court erred in granting summary judgment in favor of the Listing Agents. Connell, his supervising broker, Clapp, and his brokerage agency, Flutobo, also moved for traditional and no-evidence summary judgment on all of the Hammonds' claims against them. As set out above, however, the enforceable as-is clause negates causation as a matter of law regarding the claims against the Listing Agents.

The Hammonds contend that Connell himself made misrepresentations that fraudulently induced them into closing on the sale and that his supervising broker and brokerage agency are vicariously liable for Connell's alleged wrong-doing. We observe, however, that the Hammonds failed to provide any evidence of a misrepresentation by Connell.

Regarding any purported misrepresentations by Connell in connection with the Seller's Disclosure, we observe that there is no evidence that Connell, whether in his capacity as the agent or in his capacity as Hanser's boyfriend, made any of

34

the representations in the Seller's Disclosure. The law imposes a duty on sellers of real property, not their agents, to complete the Seller's Disclosure. *See* TEX. PROP. CODE § 5.008(a), (d); *Pena*, 2022 WL 17685119, at *7. The Seller's Disclosure Notice makes it clear that the representations within the Notice are the seller's alone, stating, "This notice is a disclosure of seller's knowledge of the condition of the property as of the date signed by seller and is not a substitute for any inspections or warranties the buyer may wish to obtain. It is not a warranty of any kind by seller, seller's agents, or any other agent." *Pena*, 2022 WL 17685119, at *7 & n.18 (discussing identical seller's disclosure form). The Seller's Disclosure here was signed only by Hanser as the sole owner of the Property.

"[U]nless a broker or real estate agent knows information in a Seller's Disclosure Notice is false, a real estate agent and the agency [he] works for is generally not liable for the representations or omissions in the Seller's Disclosure Notice because the representations in the Notice are the seller's alone." *Id.* at *7 (citing *Van Duren*, 569 S.W.3d at 188); *see also* TEX. OCC. CODE § 1101.805(e) (creating exception that applies if broker is shown to have known sellers made false representation, or knows seller misrepresented or concealed material facts and broker failed to disclose their own knowledge of seller's misrepresentation or concealment). The Hammonds presented no evidence that Connell or any Listing

35

Agent knew that any of Hanser's representations in the Seller's Disclosure were false.

Likewise, regarding the representations made by Hanser and communicated through Connell in the October 1, 2017 email regarding the kitchen window, stucco repairs, and the closet wet spot, there is no evidence that Connell himself knew that any of the statements were false. There is no evidence that Connell knew Hanser had omitted material information, nor is there evidence that he himself knew but failed to disclose material information about the Property. The mere fact of his dating relationship with Hanser—which was disclosed to the Hammonds at the time of the sale—does not prove that Connell knew about and failed to disclose any defect in the Property. *See Kubinsky v. Van Zandt Realtors*, 811 S.W.2d 711, 714 (Tex. App.—Fort Worth 1991, writ denied) (holding that listing real estate agent has no legal duty to inspect listed property beyond asking sellers if such defects exist). The Hammonds do not identify any other statements or representations made by Connell.

We have already concluded that the Hammonds presented no evidence of a misrepresentation by Hanser that would support a conclusion that she fraudulently induced them into the as-is purchase of the Property. We likewise conclude that there is no evidence that Connell or any of the Listing Agents fraudulently induced the Hammonds into the as-is purchase of the Property. *See Van Duren*, 569 S.W.3d

36

at 188 ("To show fraudulent inducement . . . the [buyers] must show that [the seller] made a false material representation, knew it was false when made, intended to induce reliance, and did induce reliance.").

We conclude that the trial court's summary judgment in favor of the Listing Agents on the Hammonds' claims for negligence, gross negligence, negligent misrepresentation, common-law fraud and fraud by nondisclosure, statutory fraud in sale of real estate, and violation of the DTPA was supported by the presence of the enforceable as-is clause.

Finally, we further conclude that the trial court's summary judgment in favor of Hanser and the Listing Agents on the Hammonds' civil conspiracy claim was likewise proper.[3] Civil conspiracy is not an independent tort but is instead a theory of vicarious tort liability derivative of an underlying wrong. *See Agar Corp. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 140–41 (Tex. 2019); *see also Chu v. Hong*, 249 S.W.3d 441, 444–45 (Tex. 2008) (holding that, in civil conspiracy,

---

[3] In their live pleading, the Hammonds identify this claim as "Civil Conspiracy and Aiding & Abetting." They then alleged elements consistent with a civil conspiracy claim. Thus, our conclusion that summary judgment was proper on these claims for civil conspiracy also encompasses any intended allegations of aiding and abetting. *See First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 225 (Tex. 2017) (observing that court has "never expressly recognized a distinct aiding and abetting cause of action," some courts have determined that "such a claim requires evidence that the defendant, with wrongful intent, substantially assisted and encouraged a tortfeasor in a wrongful act that harmed the plaintiff"); *see also Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 930–31 (Tex. 2010) (holding that when fraud claim based on purported misrepresentations fails, conspiracy and aiding and abetting claims dependent on that fraud fail as well).

plaintiff seeks to hold defendant liable for injury caused by third party who has acted in combination with defendant for common purpose). Because we have concluded that, as a matter of law, the Hammonds cannot recover on any of their other tort or breach of contract claims, they likewise cannot recover for civil conspiracy. *See Agar Corp.*, 580 S.W.3d at 141 (holding that "[c]ivil conspiracy depends entirely on the injury caused by the underlying tort; the injury is the damage from the underlying wrong, not the conspiracy itself"; citing *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983) in setting out elements of civil conspiracy as including (1) two or more persons; (2) object to be accomplished; (3) meeting of minds on object or course of action; (4) one or more unlawful, overt acts; and (5) damages as proximate result).

We overrule the Hammonds' first and second issues challenging the trial court's grant of summary judgment dismissing with prejudice all of their claims against Hanser and the Listing Agents.

## D. Objections to Summary Judgment Evidence

In their third issue, the Hammonds contend that the trial court erred in sustaining Hanser's objections to certain summary judgment exhibits.

"[T]he same evidentiary standards that apply in trials also control the admissibility of evidence in summary-judgment proceedings." *FieldTurf USA, Inc. v. Pleasant Grove Indep. Sch. Dist.*, 642 S.W.3d 829, 837 (Tex. 2022) (quoting

38

*Seim v. Allstate Tex. Lloyds*, 551 S.W.3d 161, 163–64 (Tex. 2018)). We review a trial court's ruling to exclude summary judgment evidence for an abuse of discretion. *Starwood Mgmt., LLC v. Swaim*, 530 S.W.3d 673, 678 (Tex. 2017) (per curiam). Further, a trial court's error in excluding evidence is reversible only if it probably caused the rendition of an improper judgment. *JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 165 (Tex. 2015) (citing TEX. R. APP. P. 44.1(a)(1)).

Summary-judgment evidence must be presented in a form that would be admissible at trial. *Fortitude Energy, LLC v. Sooner Pipe LLC*, 564 S.W.3d 167, 178 (Tex. App.—Houston [1st Dist.] 2018, no pet.). Generally, hearsay and unauthenticated documents would not be admissible at trial. *See* TEX. R. EVID. 802, 901(a).

The trial court sustained Hanser's objections to the following exhibits: (1) Exhibit 4, an unauthenticated "warranty ticket" related to Hanser's request for repairs that the Hammonds allegedly received from InTown; (2) Exhibit 5, an unauthenticated invoice from Garcia's Stucco LLC allegedly received from InTown related to repairs that InTown made to the Property; (3) Exhibit 18, an unauthenticated e-mail from Connell to Barbara Marin, "mclapp@kw.com", and Daryl Zipp in which Connell purportedly denied any knowledge of problems with the Property and asserted that he had fulfilled his obligations as the real estate agent; (4) Exhibits 21 and 22, unauthenticated Seller's Disclosure Notices for

neighboring properties; (5) the last page of Exhibit 27, an unauthenticated website picture of the Property with markings around part of the structure; (6) Exhibit 28, an unauthenticated "Residential Property Survey Information" that appeared to be part of a intake form for a property-tax valuation challenge; and (7) Exhibit 29, an unauthenticated invoice/receipt from Kiwi Services that purported to show that Connell paid for carpet cleaning service at the Property. Hanser argues that these unauthenticated exhibits contained inadmissible hearsay and, therefore, the trial court properly sustained her objections to them.

The Hammonds contend that the trial court abused its discretion because they provided evidence demonstrating the source of each exhibit through deposition testimony or other methods. They further argue that, even if the evidence was properly excluded in the context of their response to Hanser's motion for summary judgment, the Listing Agents did not join her objections to this evidence and so the evidence must still be considered in the context of their response to the Listing Agents' motion for summary judgment.

We have already concluded, as set out above, that the Hammonds presented no evidence that either Hanser or Connell fraudulently induced them into the as-is purchase of the Property. Nothing in the above-described, contested evidence would change our analysis. Nothing in the warranty tickets, emails, or other items of evidence indicates that either Hanser or Connell knew about problems with the

40

stucco or the other identified issues at the time of the sale and failed to disclose them to the Hammonds with the intent to fraudulently induce them into the as-is purchase of the Property. *See Van Duren*, 569 S.W.3d at 188 ("To show fraudulent inducement . . . the [buyers] must show that [the seller] made a false material representation, knew it was false when made, intended to induce reliance, and did induce reliance.").

Accordingly, the Hammonds cannot show that any error by the trial court in excluding evidence probably caused the rendition of an improper judgment. *See JLG Trucking*, 466 S.W.3d at 165.

We overrule the Hammonds' third issue.

## Conclusion

We affirm the trial court's judgment dismissing all of the Hammonds' claims with prejudice.


Richard Hightower
Justice

Panel consists of Chief Justice Adams and Justices Hightower and Countiss.

41